UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHELE ELLEN SCALPI,

                                        Plaintiff,

        v.

POLICE OFFICER TINA AMORIM,

                                        Defendant.

No. 14-CV-2126 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Michelle Ellen Scalpi
West Haven, CT
*Pro Se Plaintiff*

Adam Lawrence Rodd, Esq.
Alana R. Bartley, Esq.
Drake, Loeb, Heller, Kennedy, Gogerty, Gaba & Rodd, PLLC
New Windsor, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Pro se Plaintiff Michelle Ellen Scalpi ("Plaintiff") brought this Action against Police

Officer Tina Amorim ("Defendant"), alleging that Defendant subjected Plaintiff to an

unreasonable search and excessive force in violation of her Fourth Amendment rights. (Am.

Compl. (Dkt. No. 75).) Before the Court is Defendant's Motion for Summary Judgment.

(Notice of Mot. For Summ. J. (Dkt. No. 173).) For the following reasons, the Motion is granted.

I. Background

A. Factual Background

The following facts are taken from the exhibits submitted, (Exhibit List ("Def.'s Ex.")

(Dkt. No. 170)), Defendant's statement pursuant to Local Civil Rule 56.1, (Def.'s Rule 56.1

Statement ("Def.'s 56.1") (Dkt. No. 171)), and Plaintiff's submissions, (Witness Statement (Dkt.

No. 185); Summ J. Resp. ("Pl.'s Mem.") (Dkt. No. 186); *id.* at Ex. ("Pl.'s Ex.")), and are

recounted "in the light most favorable to" Plaintiff, the non-movant.[1] *Wandering Dago, Inc. v.*

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). "A pro se litigant is not excused from this rule," *Brandever v. Port Imperial Ferry Corp.,* No. 13–CV–2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (italics omitted), and "[a] nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible," *T.Y. v. N.Y.C. Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir. 2009); *see also Biberaj v. Pritchard Indus., Inc.,* 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) (same). Here, Defendant filed and served her statement pursuant to Rule 56.1, (Dkt. No. 171), and Plaintiff failed to submit a response. Accordingly, the Court may conclude that the facts in Defendants' 56.1 Statement are uncontested and admissible. *See Brandever,* 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal,* No. 11–CV–9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

However, Defendant did not file and serve a statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2. *See* Local Civ. R. 56.2 ("Any represented party moving for summary judgment against a party proceeding pro se shall serve and file as a separate document, together with the papers in support of the motion, the following 'Notice To Pro Se Litigant Who Opposes a Motion For Summary Judgment' with the full texts of Fed. R. Civ. P. 56 and Local Civil Rule 56.1 attached."). Yet, Plaintiff filed both a "Witness Statement," signed "under penalty of perjury," purportedly containing Plaintiff's testimony, (Witness Statement), and an opposition to the Motion for Summary Judgment, which includes several statements about the facts of this case and appends several documents for the Court's consideration, (Pl.'s Mem.; Pl.'s Ex.). Therefore, recognizing that pro se litigants are entitled to "special solicitude . . . when confronted with motions for summary judgment," *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988), the Court considers the statements and documents in Plaintiff's opposition papers to determine if there are any material issues of fact based on the admissible evidence in the record, *see Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted)); *Cherry v. Byram Hills Cent. Sch. Dist.,* No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) (italics omitted) ("[W]here a pro se plaintiff fails to submit a proper . . . Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some

*Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (internal quotation marks omitted). The facts as described below are not in dispute, except to the extent indicated.

### 1. The March 17, 2014 Incidents

#### a. Pat and Frisk Search

On February 5, 2011, Plaintiff was arrested for speeding and driving without a license in East Fishkill, New York. (Def.'s 56.1 ¶ 13.) On April 24, 2013, after Plaintiff failed to appear at a scheduled court appearance, Judge Frederick D. Romig of the East Fishkill Town Court issued a Bench Warrant authorizing Plaintiff's arrest. (*Id.* ¶ 14; Def.'s Ex. F.) On March 17, 2014, Plaintiff was pulled over on the Taconic State Parkway by New York State Park Police Officer James Seresky ("Seresky") for speeding. (Def.'s 56.1 ¶ 15; Seresky Aff. ¶ 3 (Dkt. No. 176).) Plaintiff was driving without a valid driver's license. (Def.'s 56.1 ¶ 16.) Seresky subsequently discovered that there was a warrant out for Plaintiff's arrest and informed her of this fact. (*Id.*

---

discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (internal quotation marks omitted)). However, where factual assertions in Plaintiff's opposition papers do not contain citations to the record, the Court disregards them. *See Holtz*, 258 F.3d at 73 (explaining that the court is not require to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the court's attention); *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 502 n.1 (S.D.N.Y. 2015) ("[M]any of the factual assertions in Plaintiff's opposition papers either do not contain citations to the record, or are not supported by the citations in the record. The Court disregards all such assertions."). Moreover, to the extent that Plaintiff's "Witness Statement" contradicts her earlier deposition testimony, (Def.'s Ex. L; Letter from Adam L. Rodd, Esq. to Court (Feb. 12, 2018) (Dkt. No. 193) Ex. 1 ("Pl.'s Dep.")), the Court will also disregard it, *see In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) (per curiam) (explaining that "the 'sham issue of fact' doctrine . . . prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony"); *see also Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony."). The Court further notes that, although the deposition transcript submitted as Defendant's Exhibit L was missing some pages, the Defendant later submitted the full version, which the Court reviewed when deciding the instant Motion. (Pl.'s Dep.)

¶ 17; Seresky Aff. ¶ 4.)  Therefore, "the New York State Park Police contacted the Town of East Fishkill Police Department to make arrangements to transfer the custody of . . . [P]laintiff to the Town of East Fishkill Police Department at the James Baird State Park, located in Dutchess County." (Def.'s 56.1 ¶ 19.)  Seresky handcuffed Plaintiff behind her back and placed her in his patrol vehicle before driving her to James Baird Park.  (*Id.* ¶ 20; Seresky Aff. ¶ 5; Pl.'s Dep. 58.)

Defendant, a Town of East Fishkill Police Officer, met Seresky and Plaintiff at James Baird Park.  (Def.'s 56.1 ¶ 20.)  Seresky helped Plaintiff exit his vehicle.  (*Id.* ¶ 21.)  Defendant then "guided . . . [P]laintiff over to her patrol car and advised . . . [P]laintiff that she was going to search her." (*Id.* ¶ 22.)  "It is standard police protocol to conduct a search of an arrestee prior to the placement of such individual in a police vehicle for purposes of a transfer.  The purpose of such a search is to check for weapons or other concealed items that could pose a potential safety hazard or threat to the transporting officer or officers, and the arrestee." (Amorim Aff. ¶ 12 (Dkt. No. 175); *see also* Seresky Aff. ¶ 7 (same).)  Plaintiff did not object.  (Def.'s 56.1 ¶ 23.) Defendant then conducted a pat-down search of Plaintiff that lasted "just several seconds." (*Id.* ¶ 25.)

Although the Parties agree that Defendant was standing behind Plaintiff during the search, (*see id.* ¶ 24; Pl.'s Dep. 62), they disagree about how it was conducted.  At the time of the search, Plaintiff was "wearing a hoodie, a long-sleeved shirt, a bra, pants, underwear, socks and sneakers." (Def.'s 56.1 ¶ 18.)  Defendant avers that she "plac[ed] both of [her] hands on the outside of . . . [P]laintiff's jeans to feel for the presence of concealed weapons" by "plac[ing] both of [her] hands on each of . . . [P]laintiff's legs (and on the outside of her jeans) and felt for weapons from the area of . . . [P]laintiff's upper thighs to her ankles." (Amorim Aff. ¶ 14.) Defendant further claims that "[a]t no time did [she] reach under . . . [P]laintiff's jeans" or

"touch, hit, strike or make contact with . . . [P]laintiff's genital area." (*Id.*) Next, Defendant claims that she "placed [her] hands on the bottom part of . . . [P]laintiff's hoodie/sweatshirt, and shook the hoodie/sweatshirt to check for concealed items," of which there were none. (*Id.* ¶ 15.) "Following this, [Defendant] slid [her] hands across the beltline area of . . . [P]laintiff's jeans (by placing [her] hands on the outside of . . . [P]laintiff's jeans) to check for concealed items," of which there were none. (*Id.*) Next, Defendant contends, "with [her] hands placed on the outside of . . . [P]laintiff's hoodie/sweatshirt, [Defendant] slid [her] hands from the middle to the outside of the back portion of . . . [P]laintiff's bra line to feel for concealed weapons," of which there were none. (*Id.*) "Following this, [Defendant] placed the back of [her] hands on the outside of the front portion of . . . [P]laintiff's bra line to feel for concealed weapons or items," of which there were none. (*Id.*) Defendant claims that "[a]t no time did [she] reach under . . . [P]laintiff's shirt, or otherwise touch or grab . . . [P]laintiff's breasts or bra area with the front of [her] hands." (*Id.*)

Seresky avers that he "observed [Defendant] conduct a brief pat-down search of [Plaintiff]." (Seresky Aff. ¶ 7.) He claims that the pat-down search "was performed over [Plaintiff's] clothing, and involved the routine placement, by [Defendant], of her hands around and upon [Plaintiff's] legs, abdomen and torso to feel for weapons and/or concealed items." (*Id.* ¶ 8.) Seresky states that "[a]t no time during [Defendant's] pat-down search of [Plaintiff] did [he] observe [Defendant] strike, hit, or touch [Plaintiff's] genital area" or grab [Plaintiff's] breasts." (*Id.* ¶¶ 9–10.)[2]

---

[2] However, Plaintiff submits that "Seresky was *not* in a position to have observed the strike to the vaginal area or the intrusion of Plaintiff[']s under garments," because he "was stationed several feet behind . . . Defendant in conversation with another Officer," and Defendant was standing behind Plaintiff, who was up against a patrol car, thus impeding Seresky's view of Plaintiff's chest or upper thighs. (Pl.'s Mem. 4 (internal quotation marks omitted).)

In disputing Defendant's account, Plaintiff testified:

> [Defendant] had me face the vehicle. She went --- she went down my legs. She went inside my belt into my pockets. She went down my legs and then brought her hand back up and that is when she hit me forcefully in the genital area, and then she reached around my waist, she went inside my bra, but through my clothing. My clothing --- she reached underneath my hoodie and went inside my bra on both breasts.

(Pl.'s Dep. 63.) When asked to clarify what "inside the bra" meant, Plaintiff testified that her "shirt was in between [Defendant's] hand and [Plaintiff's] breast," and thus Defendant's hands were "over [her] shirt." (*Id.* at 64–65.)[3] Plaintiff also testified that Defendant patted down her legs on the outside of Plaintiff's pants, but at some point, when Defendant "had her hands on both sides of [Plaintiff's] legs and went up," Plaintiff felt a touch or hit to her genital area. (*Id.* at 65–66; *see also* Witness Statement 1 ("I was hit in the genital area during Defendant[']s search.").) When this occurred, Plaintiff "said, 'Hey, take it easy,' because [Plaintiff] flinched," but "[t]hat was the only thing [she] said." (Pl.'s Dep. 65.)

After the pat down search was complete, Plaintiff did not request medical attention or say she was in pain or discomfort. (Def.'s 56.1 ¶¶ 26–27.) Defendant then removed Plaintiff's existing handcuffs and applied new ones, also behind Plaintiff's back, and advised Plaintiff that she would be transported to the Town of East Fishkill Police Department ("Police Department"). (*Id.* ¶ 28.) Plaintiff did not complain after the new handcuffs were applied or during the drive, in Defendant's patrol car, from James Baird Park to the Police Department. (*Id.* ¶¶ 29–30.)

---

[3] Plaintiff states in the Witness Statement that "Defendant did place her hand inside of my bra during her search." (Witness Statement 2.) To the extent Plaintiff is now claiming that Defendant placed her hands inside Plaintiff's bra to touch her breast, as opposed to in between Plaintiff's shirt and bra, this statement is inconsistent with her prior deposition testimony and the Court will not consider it. *See In re Fosamax Prod. Liab. Litig.*, 707 F.3d at 193.

<u>b. Removal of Handcuffs</u>

Plaintiff and Defendant arrived at the Police Department around 3:30 p.m.  (*Id.* ¶ 31.)

Defendant walked Plaintiff, who was still handcuffed behind her back, into the building.  (Pl.'s

Dep. 70; Def.'s Ex. Q ("Entrance In Cam.") at 3:41:11–3:41:15 pm.)[4]  Plaintiff asked to use the

bathroom, so Defendant removed her handcuffs.  (Pl.'s Dep. 70; Def.'s 56.1 ¶ 31.)  However, the

manner in which Defendant removed the handcuffs is disputed.  Defendant, relying on a

surveillance video capturing the incident in the Police Department, (*see* Def.'s Ex. Q ("Squad

Rm. Cam.")), claims that the entire process lasted less than one minute, and "[a]t no time did

[Defendant] apply force, or excessive force, in removing the handcuff from . . . [P]laintiff's left

wrist."  (Amorim Aff. ¶¶ 20–21.)[5]  Specifically, Defendant claims that:

> [A]t approximately 3:41:51 p.m., [Defendant] initially removed . . . [P]laintiff's hat.
> Next, between 3:41:57 and 3:42:10 p.m., [Defendant] used [her] handcuff key to
> unlock the locking mechanism of the handcuff affixed to . . . [P]laintiff's right
> wrist—a process that took approximately 15 seconds.  As . . . [P]laintiff's right
> handcuff was unlocked, [Defendant] asked . . . [P]laintiff to place her hand on the
> back of her head, and . . . [P]laintiff complied with same.
>
> At approximately 3:42:19 p.m., [Defendant] extended . . . [P]laintiff's left arm to
> her side to remove . . . [P]laintiff's left handcuff.  [Defendant] extended . . .
> [P]laintiff's left arm up and to her side so that [she] could more easily access and
> visualize the keyhole of the handcuff affixed to . . . [P]lainitiff's left wrist.  The
> handcuff was removed by [Defendant] approximately 15 seconds later, as of
> 3:42:28.

---

[4] The disc submitted as Exhibit Q contains several files, none of which has audio.  The
file entitled "031714 Entrance in CAM5" is the one containing the video of the entrance to the
Police Department.  (*See* Entrance In Cam.)  Plaintiff does not contest the authenticity of this
video.

[5] The file entitled "03174 Squad Rm Cam3.asf" on the Exhibit Q disc is the one
containing the video of the handcuffing incident in the squad room.  (*See* Squad Rm. Cam.)
Plaintiff questions the authenticity of this video in the form of a spoliation motion, (Req. to
Submit Mot. for Spoliation of Ev. ("Spoliation Mot.") (Dkt. No. 189); Pl.'s Mem. 1–3, 14),
which the Court will address later in this Opinion.

(*Id.*; *see also* Squad Rm. Cam. at 3:41:51–3:41:53 pm (Defendant removing Plaintiff's hat); *id.* at 3:41:57–3:42:11 pm (Defendant unlocking Plaintiff's right handcuff); *id.* at 3:42:12–3:42:15 pm (Plaintiff placing her right hand on her head); *id.* at 3:42:16–3:42:28 pm (Defendant extending Plaintiff's left arm up to the side and turning it to face Defendant to remove Plaintiff's left handcuff).) Defendant further claims that Plaintiff "did not, at any time, complain to [her] of any pain in her left shoulder during her stay" at the Police Department, nor did she, "at any time, ask [Defendant] or any other personnel . . . for medical assistance." (Amorim Aff. ¶ 22.)

Plaintiff agrees that Defendant initially removed Plaintiff's right handcuff and then "asked [Plaintiff] to put [her] hand on [her] head." (Pl.'s Dep. 75.) However, Plaintiff testified that Defendant "took [her] left hand and twisted it and brought it up to the side." (*Id.*; *see also* Witness Statement 2 ("My arm was twisted behind my back . . . . Defendant did twist the arm to the side and up.").) Plaintiff screamed "you're breaking my arm," but Defendant "held [her] hand up in the air in an unnatural position and [Plaintiff] felt pain," while Defendant "told [her] to stand still and don't move." (Pl.'s Dep. 75; *see also* Witness Statement 2 ("I did cry out in pain 'you are breaking my arm.' Defendant continued to twist my arm.").)[6] Plaintiff felt pain in her left shoulder, which she had previously injured in a motorcycle accident. (Def.'s 56.1 ¶ 7;

_____

[6] When asked at her deposition, "Do you remember anything else about [the incident] other than what you have already testified to?", Plaintiff said "I don't believe so. I think that is it." (Pl.'s Dep. 76.) Therefore, to the extent Plaintiff's Witness Statement contains additional testimony regarding the handcuffing incident not provided in her deposition, and without any other record citations, the Court declines to consider such testimony for purposes of creating a dispute of material fact at this stage. (*See* Witness Statement at 2 (referencing buckling of the knees, feeling "a 'pop' in [her] shoulder," and Defendant shouting that was not mentioned at the deposition).)

Pl.'s Dep. 27–35, 75–76, 99.)[7]  Indeed, Plaintiff is shown grimacing on the video.  (*See* Squad Rm. Cam. at 3:42:18 pm.)

After Plaintiff was uncuffed, at approximately 3:42:35 pm, Plaintiff used the bathroom and discovered she was bleeding.  (Pl.'s Dep. 71–72; Witness Statement 2; Squad Rm. Cam at 3:42:28 pm (left handcuff off); *id.* at 3:42:32–3:42:34 pm (Plaintiff brings both arms, free of handcuffs, down to her side); *id.* at 3:42:42 pm (Plaintiff entering the bathroom while Defendant waits outside door).)[8]  Plaintiff then asked Defendant for a sanitary napkin.  (Pl.'s Dep. 72; Def.'s 56.1 ¶ 34; Witness Statement 2; Squad Rm. Cam. at 3:42:45–3:42:50 pm (Defendant re-opening bathroom door to speak with Plaintiff and then closing it again).)  Defendant said the Police Department did not have any and suggested that Plaintiff use toilet paper instead.  (Pl.'s Dep. 72; Def.'s 56.1 ¶ 34; Witness Statement 2.)  Plaintiff then placed toilet paper by her vaginal area before putting her underwear and pants over it.  (Pl.'s Dep. 72–73.)

After Plaintiff returned from the bathroom, Plaintiff removed her own shoes.  (Squad Rm. Cam. at 3:44:07 pm (Plaintiff exiting the bathroom); Amorim Aff. ¶ 26 (citing Squad Rm. Cam.

---

[7] In her deposition, Plaintiff testified that she injured her left shoulder in a motorcycle accident in 1996 or 1997, (Pl.'s Dep. 27), and doctors, after performing an x-ray, informed her that her left shoulder "was impacted," her upper arm was "fractured at the end of the shoulder bone," (*id.* at 32–33), and that, although she was told to see an orthopedic surgeon, the doctor did not examine her because of her lack of insurance, and instead told her she "needed to get [her] shoulder looked at . . . it seemed like a severe injury," (*id.* at 33–35).  (*See also* Witness Statement 5 ("I did have a motorcycle accident in 1996.  I impacted my left shoulder and fractured my left upper arm.  I do not remember *any* diagnosis of 'sprain' or 'rupture' . . . [or] muscular, tendon, or ligament damage.").)  Plaintiff was still able to perform work, including assembly of products and heavy lifting, without physical limitations after this incident.  (Pl.'s Ex. N; *see also* Witness Statement 5.)

[8] In her Amended Complaint, Plaintiff alleged that she "used facilities and noticed evidence of menstrual cycle happening."  (Am. Compl. ¶ 69; *see also* Def.'s 56.1 ¶ 33.)  However, at her deposition, Plaintiff testified that she used that phrase because she "didn't know what else to use" and "that is the terminology [she] used because there was blood coming from that area."  (Pl.'s Dep. 71, 73.)  Plaintiff now avers that she "beg[a]n to bleed as a result of [Defendant's] blunt force trauma."  (Witness Statement 1.)

at 3:44:20–3:44:36 pm (Plaintiff going to sit on bench, removing both shoes, and handing them to Defendant)).) Defendant then handcuffed Plaintiff to the bench inside of a holding cell. (Pl.'s Dep. 73–74; Squad Rm. Cam. at 3:44:37–3:45:17 pm (Defendant bringing Plaintiff into holding cell next to bench in squad room); Def.'s Ex. Q. ("Detention Cam.") at 3:44:38–3:45:03 pm (Defendant handcuffing Plaintiff to bench inside cell).)[9] At approximately 5:20:30 p.m., Plaintiff was removed from her holding cell, and she then put on her own belt and shoes. (Amorim Aff. ¶ 27; Squad Rm. Cam. at 5:20:30–5:21:05 pm (Plaintiff exiting cell and putting on belt and shoes); Detention Cam. at 5:20:10–5:20:30 pm (Defendant un-handcuffing Plaintiff from bench and Plaintiff exiting holding cell).) At approximately 5:31 p.m., Plaintiff was released from the Police Department. (Def.'s 56.1 ¶ 35.) A New York State Trooper picked Plaintiff up to transport her to the Town of Newburgh Justice Court, where there was another pending Bench Warrant for her arrest. (*Id.* ¶ 36; *see also* Squad Rm. Cam. at 5:26:04 pm (Trooper arriving in squad room and approaching Plaintiff).) During this transfer, Plaintiff was handcuffed behind her back again. (Pl.'s Dep. 79, 81; Squad Rm. Cam. at 5:27:03–5:27:38 pm (Trooper handcuffing Plaintiff in squad room).) Upon arrival, Plaintiff again used the bathroom and saw she was "still bleeding," so she "asked the trooper for a sanitary napkin." (Pl.'s Dep. 82–83.) However, the trooper said "they didn't have any and told [Plaintiff] to reapply toilet paper." (*Id.* at 83; *see also* Def.'s 56.1 ¶¶ 37–38.)

After appearing in court that same day, Plaintiff was brought to the Orange County Jail by a New York State Trooper. (Pl.'s Dep. 84–86; Def.'s 56.1 ¶ 39.) Plaintiff asked several times "for a sanitary napkin because [her] genital area was starting to burn and get irritated." (Pl.'s

---

[9] The file containing the video of Plaintiff's holding cell on the disc in Exhibit Q is called "031714 Detention CAM4." (*See* Detention Cam.) Plaintiff does not contest the authenticity of this video.

Dep. 87; *see also* Am. Comp. ¶ 102 (alleging that Plaintiff "made several requests to use the bathroom and explained [she] had toilet paper in [her] pants all day as [she] was denied sanitary needs from all police" and that she "was experiencing extreme burning").)  Plaintiff was released on bail that night.  (Pl.'s Dep. 88–89.)[10]

### 2. The Medical Evidence

Plaintiff first sought medical attention the next day, when she presented to the emergency room at New Milford Hospital.  (Def.'s 56.1 ¶ 41; Pl.'s Dep. 90.)[11]  Plaintiff informed hospital personnel that she had used toilet paper instead of a sanitary napkin.[12]  (Def.'s 56.1 ¶ 42; *id.* ¶ 43

---

[10] It is undisputed that Plaintiff experienced vaginal burning and pain in her left shoulder after the incidents on March 14, 2014.  Thus, even assuming they are not hearsay, the Court need not describe in detail the several "Witness Statements" Plaintiff submitted to establish that fact.  (*See* Pl.'s Ex. M; *see also id.* Ex. K, L (two affidavits which describe Plaintiff's alleged injuries).)

[11] Both Parties submitted portions of Plaintiff's medical records as exhibits.  (Def.'s Ex. M, N; Pl.'s Ex. G, H, I.)  Neither Party disputes the authenticity or admissibility of these records.  Indeed, both Parties rely on them in their papers, and Plaintiff testified to their accuracy at her deposition.  Therefore, the Court will consider the medical records in deciding the instant Motion, despite the fact that neither Party has established their admissibility under the business record exception to the hearsay rule.  *See Perpall v. Pavetek Corp.*, No. 12-CV-336, 2017 WL 1155764, at *8 (E.D.N.Y. Mar. 27, 2017) ("Courts in this Circuit have generally held that medical records are admissible under the business record exception to the hearsay rule, provided that they satisfy the requirements of FRE 803(6)." (collecting cases)); *id.* at *9 (considering the medical records submitted in support of a motion for summary judgment because the plaintiffs relied on reports and notes of the same doctors, and even some of the same reports and notes submitted by the defendants, plaintiffs did not question the authenticity of the medical records, and the records could "reasonably be reduced to admissible form at trial" (internal quotation marks omitted)).

[12] Plaintiff and Defendant both produce two of the same medical records from New Milford Hospital, labeled "Emergency Visit Note," (Def.'s Ex. M. at 11; Pl.'s Ex. I at 4), and "Emergency Center IV Med Sheet," (Def.'s Ex. M. at 7; Pl.'s Ex. I at 2).  The Emergency Visit Note states, under the "history of present illness" section:

> 40-year-old, Caucasian female claims that she was arrested yesterday and spent the night in jail[,] was not given[] [a] tampon or pad for her period and use[d] a gene[ric] [paper] for her vaginal bleeding[.]  [T]he patient states that the paper STUCK against her vaginal wall and when she removed them[,] [i]t caused her to have a burning sensation.

(quoting Def.'s Ex. M)); Pl.'s Witness Statement 3; Pl.'s Ex. I (producing same medical record, and an additional "Emergency Center IV Med Sheet").).)[13]  After examining Plaintiff and taking a culture, the doctor diagnosed her with vaginitis—an infection of the vagina—and prescribed antibiotics.  (Def.'s 56.1 ¶ 42; Pl.'s Dep. 91; Witness Statement 3.)  The doctor told Plaintiff that the vaginitis was caused by her use of toilet paper instead of a sanitary napkin.  (Def.'s 56.1 ¶ 42; Pl.'s Dep. 91–92.)  Plaintiff's vaginitis "cleared up within 48 hours."  (Def.'s 56.1 ¶ 46; *see also* Pl.'s Dep. 97 (testifying that the vaginal issue cleared up by March 20).)  The doctor's physical exam also revealed "[n]o evidence of trauma."  (Def.'s Ex. M. at 12.)  Plaintiff was not diagnosed with any other vaginal issue or injuries, (Def.'s 56.1 ¶ 45), nor was she treated again by any other medical providers for any vaginal issues, (*id.* ¶ 47).

Plaintiff also informed New Milford Hospital personnel about her shoulder pain, but was advised to see her primary physician.  (Pl.'s Dep. 93–94; Witness Statement 3.)  The next day, on March 19, 2014, Plaintiff "went to the St. Luke's Cornwall Hospital to have her left shoulder pain evaluated."  (Def.'s 56.1 ¶ 48; *see also* Witness Statement 4.)[14]  An x-ray was taken of Plaintiff's left shoulder.  (Def.'s 56.1 ¶ 49.)  The x-ray indicated:

---

(Def.'s Ex. M. at 11; Pl.'s Ex. I at 4.)  The Emergency Center IV Med Sheet similarly says Plaintiff was "in police custody yesterday – used dirty toilet paper."  (Def.'s Ex. M. at 7; Pl.'s Ex. I at 2).

[13] In her opposition, Plaintiff now contends that she told "medical staff at Milford hospital that [she] was hit in the genitalia and started bleeding afterward," (Witness Statement 3), but this allegation is nowhere to be found in her deposition, the medical records, or even the Amended Complaint.  Therefore, absent a record citation, the Court will not consider this new factual allegation.

[14] The medical records indicate that Plaintiff reported two causes for her shoulder pain to hospital personnel: (1) her "[left] shoulder got jerked while handcuffs were removed," and (2) she was "transported for several hours [with] her hands behind her back."  (Pl.'s Ex. H. at 2–3 (EDM Patient Record and St. Luke's Cornwall Hospital Emergency Room Note, respectively).)

FINDINGS:
BONES: Normal.  No significant arthropathy or acute abnormality.
SOFT TISSUES: Negative.  No visible soft tissue swelling.
EFFUSION: None visible.
OTHER: Negative
CONCLUSION:  NO ACUTE FRACTURE OR DISLOCATION.

(*Id.* ¶ 49 (quoting Def.'s Ex. N at 16); *see also* Pl.'s Dep. 95 (testifying that the x-rays didn't

show "any fractures or breaks").)  Plaintiff was diagnosed with a shoulder sprain, and told to

keep her arm in a sling and to see her primary physician.  (Pl.'s Dep. 96; Witness Statement 4;

Pl.'s Ex. H at 2 ("ORTHO Screen" showing Plaintiff was "received with sling in place" on her

left arm); *id.* at 4 (St Luke's Cornwall Hospital Emergency Room Note listing "[s]prain of

shoulder" as diagnosis and indicating that Plaintiff was instructed to "follow up with MD" and

continue with unspecified "medication use").)[15]

Plaintiff then went to see her primary physician, Dr. Coffey, but instead was examined by

his associate.  (Witness Statement 4; Pl.'s Dep. 96–97.)  This doctor recommended that Plaintiff

visit an orthopedic surgeon affiliated with their office, which Plaintiff did immediately that day.

(Pl.'s Dep. 97; Witness Statement 4.)  More x-rays were taken of Plaintiff's left shoulder; they

revealed "no fractures or breaks."  (Pl.'s Dep. 99; *see also* Pl.'s Ex. G at 4 ("Radiology Report"

category stating "NO ACUTE FRACTURE OR DISLOCATION").)  The orthopedic specialists

informed Plaintiff that it was likely "a rupture of some sort" and recommended Plaintiff get an

---

[15] Plaintiff asserts that the St. Luke's Emergency Room records show that her last menstruation was on March 12, 2017, which "substantiates [her] assertion that her menstrual cycle was one week prior and that the bleeding was *not* 'menstrual bleeding' but irregular bleeding caused by the blunt force trauma."  (Pl.'s Mem. 9.)  Although she provides no record citation, it appears Plaintiff is referring to the following line: "LMP (Female 10-50) MARCH 12, 2014."  (Pl.'s Ex. H at 3.)  This statement contradicts Plaintiff's allegation in the Amended Complaint that she "noticed evidence of menstrual cycle happening" at the Police Department.  (Am. Compl. ¶ 69.)  In any event, as explained later, this fact is not material to deciding the instant Motion.

MRI and pursue physical therapy. (Pl.'s Dep. 100–01; *see also* Witness Statement 4; Pl.'s Ex. G at 4 (listing "Pectoralis Major Tendon Rupture-Left" and "Internal Derangement shoulder-Left" under "Assessment/Plan").)[16] Plaintiff never got an MRI or attended physical therapy because of alleged insurance issues. (Pl.'s Dep. 100–01; Witness Statement 4.) Therefore, after March 20, 2014, Plaintiff neither sought nor received any additional treatment for her left shoulder. (Def.'s 56.1 ¶ 50.)[17] As of the date of her deposition—March 24, 2017—Plaintiff had only one physical complaint relating to the incidents on March 17, 2014: occasionally, when the weather changes, her shoulder "gets achy," she feels "some pressure" and "sometimes the pain runs a little bit to [her] shoulder blade." (Pl.'s Dep. 115; *see also* Witness Statement 5 (stating that she "use[d] the sling on and off when [she] had pain in the shoulder for about [2–3] more months" after the

---

[16] The Court notes that these statements are likely inadmissible hearsay. However, Defendant does not make this argument, and in any event both Parties rely on similar statements in Plaintiff's medical records.

[17] Therefore, to the extent that Plaintiff now contends she experiences "overwhelming pain" and "discomfort" that makes her "unable to perform work tasks that easy for [her] prior to March of 2014," (Witness Statement 5), the Court disregards these claims as contradictory to her prior sworn testimony, *see In re Fosamax Prod. Liab. Litig*., 707 F.3d at 193. Plaintiff also testified at her deposition that she had not sought any other employment since the events on March 17, 2014. (Pl.'s Dep. 114). Curiously, Plaintiff sought construction work in May 2017— after her deposition—and claims she could not complete it because of her shoulder injury. (Witness Statement 5.) Aside from her assertion, with no record citation, that she is "unable to perform work tasks that were easy for [her] prior to March of 2014," (*id.*), she submitted affidavits from two individuals stating that Plaintiff was unable to perform the demolition work in May 2017, (*see* Pl.'s Ex. L (Tina Ford Aff.); *id.* Ex. N (Alan Smith Aff.)). To the extent that this evidence shows that Plaintiff could not physically complete the May 2017 construction project, that fact is undisputed. However, the Court declines to accept this evidence as creating a disputed fact contrary to Plaintiff's prior testimony—that prior to March 2017 she did not experience serious pain or fail at completing work tasks she previously could have completed. (*See, e.g.* Tina Ford. Aff. 2 ("After March of 2014, [Plaintiff] was extremely limited in her physical abilities. [Plaintiff] showed pain symptoms consistently for months after the incident with the police.").)

incident); Def.'s Ex. O ("Weiner Report") 3 ("At the present time, [Plaintiff] states that she has discomfort in her left shoulder with inclement weather.").)[18]

On April 4, 2017, Dr. Bradley Weiner, a Board Certified Orthopedic Surgeon, performed a physical examination of Plaintiff. (Weiner Aff. (Dkt. No. 177) ¶¶ 1, 5; Pl.'s Mem. 4–5; Weiner Report 3.) He also reviewed Plaintiff's medical records, including her x-rays, and the video surveillance from the Police Department. (Weiner Report 3–5; Weiner Aff. ¶ 5.) Dr. Weiner concluded that Plaintiff has a diagnosis of "[l]eft shoulder arthralgia" and stated:

> The claimant has suggested that her left shoulder was injured by an arresting officer who forcefully removed her handcuffs on March 17, 2014. The video surveillance footage clearly contradicts the claims made by [Plaintiff]. It is my professional opinion, within a reasonable degree of medical certainty, that there is no evidence to support any claim for a structural injury to the left upper extremity as a consequence of the removal of her handcuffs on March 17, 2014. The claimant has a documented history of significant injury to the left shoulder dating back to 1996, for which she failed to seek out medical treatment. The claimant's current minor restrictions to range of motion documented on today's examination appear to represent her baseline level of function following her initial traumatic injury in 1996. There is no objective medical evidence whatsoever to support a claim for injury to the left shoulder based on the incident that occurred on March 17, 2014. It is my professional opinion that the claimant does not warrant any consideration for orthopaedic treatment based on the incident of record.

(Weiner Report 5; *see also* Weiner Aff. ¶ 9 (explaining that the physical examination revealed "minor limitations of motion of the left shoulder" but opining that "there is no objective evidence whatsoever to support a claim of injury to the left shoulder based on the removal of handcuffs"); *id.* ¶ 7 (opining, based upon video footage, that "[t]he removal of the handcuffs, and the raising of . . . [P]laintiff's left arm, did not result in the positioning of . . . [P]laintiff's left arm and shoulder joint in an anatomically abnormal manner that caused an objectively verifiable injury to either the . . . left arm or shoulder joint").) He further opined that "[i]t is not uncommon for an

---

[18] When further asked if she had any other complaints about her shoulder, Plaintiff testified, "[t]hat is it." (Pl.'s Dep. 115.)

individual to experience some short-term discomfort or pain when a moveable joint is placed in a fixed position for some extended period of time—as can occur by being handcuffed behind the back for a few hours." (Weiner Aff. ¶ 8 n.2.)[19]

---

[19] Plaintiff did not move to disqualify Dr. Weiner as an expert or argue that his expert opinion is inadmissible under Federal Rule of Evidence 702. *See* Fed. R. Evid. 702; *Nimely v. City of New York*, 414 F.3d 381, 395–397 (2d Cir. 2005) (describing standards governing the admissibility of expert testimony). She instead makes several arguments relating to the credibility or weight that should be assigned to his opinion—namely that: (1) the physical examination was short and used no extensive testing; (2) his conclusions based on her x-rays and the video are not relevant to the injuries she claims; (3) it is impossible to tell "based off a video . . . how many pounds of pressure or force were inflicted when Plaintiff's hand was twisted"—a fact purportedly confirmed by Plaintiff's proffered expert, Patricia Curcio; and (4) Dr. Weiner's assessment of the video and her physical limitations from the 1996 accident contradict Plaintiff's medical records. (Pl.'s Mem. 5, 14.) As an initial matter, even if not all of Dr. Weiner's observations are relevant to Plaintiff's claims, his expert opinion *is* relevant, because it makes a fact of consequence in this Action—whether Plaintiff suffered injury to her left shoulder as a result of the force used by Defendant—less probable than it would be without the evidence. *See* Fed. R. Evid. 401. Moreover, Plaintiff does not argue that Dr. Weiner is not qualified as an expert. Indeed, she would be hard pressed to, in light of his qualifications in orthopedic surgery and evaluating patients with claimed shoulder injuries, corroborated by Dr. Weiner's Affidavit and his CV, both provided to the Court as exhibits. (*See* Weiner Aff. ¶¶ 2–3; Def.'s Ex. P.) Nor does Plaintiff argue that his opinion is unreliable. Even if the Court were to construe Plaintiff's arguments about the length or intensity of the examination or his interpretation of the video as attacks on the data and methods used to form Dr. Weiner's opinion, she does not explain or substantiate them in any way such that Defendant could have responded to them in her Reply, perhaps by filing an additional affidavit from Dr. Weiner, let alone such that this Court could evaluate them. *See Nimely*, 414 F.3d at 396 (listing factors that a court may consider "in evaluating whether a proffered expert opinion has the required indicia of scientific reliability"). To the extent Plaintiff argues that Dr. Weiner's opinion is disputed by other facts in evidence, she does not cite such facts (aside from Curcio's opinion, which the Court addresses below). In any event, such a factual dispute would not make his testimony inadmissible; it would instead require the Court to determine if the dispute was material and, if so, to deny Defendant's Motion based on this dispute. Therefore, the Court will consider Dr. Weiner's opinion regarding Plaintiff's shoulder injury at this stage.

Aside from the injury to her left shoulder and her vaginitis diagnosis, Plaintiff is not claiming any other injuries from the March 17, 2014 incidents at issue in this Action. (Def.'s 56.1. ¶ 51.)[20]

B. Procedural History

Plaintiff commenced the instant Action on March 26, 2014 against Orange County, Dutchess County, Dutchess County District Attorney William Grady, Dutchess County Assistant District Attorney Melissa Knapp Pasquale, the Town, Amorim, Fields, Justice Romig, Commissioner Barbara J. Fiala, Governor Andrew Cuomo, and Steven K. Patterson. (Compl. (Dkt. No. 1).) Thereafter, all named Defendants filed Motions To Dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b). (Dkt. Nos. 40, 42, 47, 52.) Without rendering a decision on these motions, the Court granted Plaintiff's request for leave to amend her Complaint. (Dkt. Nos. 72, 74.) Plaintiff accordingly filed her Amended Complaint on December 31, 2014. (Am. Compl. (Dkt. No. 75).)

Pursuant to a briefing schedule, (Dkt. No. 88), all Defendants filed renewed Motions To Dismiss on April 9 and 10, 2015, (*see* Dkt. Nos. 89, 91, 96, 100, 104.) Plaintiff opposed these motions, (Dkt. Nos. 107, 110–113), and Defendants filed replies, (Dkt. Nos. 115, 117, 120, 122, 124.) On February 29, 2016, the Court issued 5 Opinions & Orders granting all Defendants' Motions to Dismiss, with prejudice, except Defendant Amorim's. (Dkt. Nos. 127–131.) Specifically, the Court denied the Motion To Dismiss the excessive force and unreasonable

---

[20] Although Plaintiff discusses evidence of her psychological injuries at length, (*see, e.g.*, Witness Statement 3; Pl.'s Mem. 6–7; *id.* Ex. C, D, E, F, K), the Court need not address this evidence at this stage, because it relates to *damages*, not liability. *See, e.g.*, *Disorbo v. Hoy*, 343 F.3d 172, 184 (2d Cir. 2003) (explaining that a jury could reasonably find and award damages for psychological injuries in an excessive force case, though finding the award excessive in that case).

search claims against Defendant. (Dkt. No. 129.) On March 30, 2016, Defendant filed an Answer. (Answer (Dkt. No. 135).) On April 11, 2016, and again on April 29, 2016, Plaintiff filed a Notice of Appeal from all of the Court's Opinion & Orders, (Dkt. No. 138), which the Second Circuit dismissed for lack of jurisdiction, (Dkt. No. 142).

Pursuant to a Case Management and Scheduling Order, (Dkt. No. 149), the Parties engaged in discovery. On June 7, 2017, Defendant filed a pre-motion letter describing the grounds on which she would move for summary judgment. (Letter from Adam L. Rodd, Esq. to Court (June 7, 2017) (Dkt. No. 162).) Plaintiff filed a letter opposing Defendant's request. (Letter from Plaintiff to Court (June 14, 2017) (Dkt. No. 163).) Pursuant to a scheduling order, (Dkt. No. 165), and after fixing docket entry errors, (*see* Dkt. Nos. 167–69), Defendant filed a Motion for Summary Judgment and accompanying papers, (Notice of Mot. for Summ. J.; Def.'s Ex.; Def.'s 56.1; Decl. of Adam Rodd, Esq. in Supp. of Mot. for Summ. J. (Dkt. No. 174); Amorim Aff; Seresky Aff.; Weiner Aff; Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (Dkt. No. 178).) After Defendant filed a letter explaining that, to resolve a discovery dispute, all Parties consented to, and Magistrate Judge Davison suggested that, Plaintiff be given an extension of time to file opposition papers, (Letter from Adam L. Rodd, Esq. to Court (Sept. 19, 2017) (Dkt. No. 183)), the Court revised the briefing schedule, (Dkt. No. 184). On November 1, 2017, Plaintiff filed an opposition to the Motion for Summary Judgment along with accompanying exhibits and a "Witness Statement." (*See* Pl.'s Mem.; Witness Statement.) Defendant filed a reply on November 20, 2017. (Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Reply") (Dkt. No. 187).)

On November 27, 2017, Plaintiff filed a "Request to Submit Motion for Spoliation of Evidence" relating to the video evidence. (Spoliation Mot.) The Court ordered Defendant to

respond, (Dkt. No. 190), and Defendant opposed Plaintiff's request on December 12, 2017, (Letter from Adam L. Rodd, Esq. to Court (Dec. 12, 2017) ("Def.'s Spoliation Opp.") (Dkt. No. 191)). The Court stated in a memo endorsement that "[t]he Spoliation Motion will be resolved simultaneously with the decision on the summary judgment motion." (Dkt. No. 192).

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry*, 137 F. Supp. at 521 (same).

 "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a

[summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on

affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham,* 848 F.2d at 344; *Mercado v. Div. of N.Y. State Police,* No. 96–CV–235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir. 2006) (italics and internal quotation marks omitted). And, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vermont Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F. 3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[] made in light of the opposing party's pro se status" (italics omitted)). Nonetheless, "proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary judgment." *Houston*, 27 F. Supp. 3d at 351 (internal quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

B.  Analysis

1.  Evidentiary Issues

As an initial matter, the Court must resolve evidentiary issues relating to the video evidence submitted by Defendant.  Plaintiff makes a spoliation motion, arguing that the squad room video is not authentic and thus she deserves an adverse inference sanction, if not the exclusion of the video altogether.  (Spolitation Mot.; Pl.'s Mem. 1–3.)[21]  Relatedly, in support of that motion, Plaintiff introduces evidence from three individuals—Michelle Ferro ("Ferro"), Patricia Curcio ("Curcio"), and Chris Salonia ("Salonia")—all of whom Plaintiff at times refers to as "experts," stating that the videos are doctored or not authentic.  (Pl.'s Ex. B ("Ferro Report"); *id.* Ex. J ("Curcio Aff."); *id.* Ex. K ("Salonia Aff.").)  Defendant argues that (1) the video was not destroyed, lost, or altered; (2) Ferro's report should be excluded because Plaintiff failed to disclose her as a witness during discovery; and (3) none of the three individuals is qualified as an expert or provides an admissible expert opinion under Rule 702.  (Def.'s Spoliation Opp.; Def.'s Reply 2–4.)

a.  Experts

Plaintiff sometimes refers to Ferro, Curcio, and Salonia as "experts" providing expert opinion regarding the authenticity of the video.  (Spoliation Mot. 2 ("Plaintiff presented the video evidence to . . . both expert witnesses, i.e. Curcio and Salonia."); *id.* (describing Ferro's

---

[21] The only video Plaintiff alleges is not authentic in her submissions is the squad room video—not any of the other videos submitted in Exhibit Q.  (*See, e.g.*, Pl.'s Mem. 2 (describing the video depicting the removal of her handcuffs as "the video in question"); Pl.'s Ex. B. at 3 (expert report stating that "one section of video that brought particular suspicion is Squad RM Cam3"); Pl.'s Ex. K at 4 ("The video depicting [Plaintiff] having the handcuffs removed by the officers shows many flags and flaws as if it were cut in various places. . . .  I do not feel the video is authentic at least during the time [Plaintiff] was having her cuffs removed."); Pl.'s Ex. J at 4 ("I . . . have watched the video footage, specifically the footage of [Plaintiff] having her handcuffs removed.").)

video report as "expert analysis"); Witness Statement 6 (describing Ferro as an expert); Pl.'s Mem. 1 (calling Ferro an "Expert Witness" and Curcio and Salonia "two independent videographers"); *id.* at 3 (calling Curcio and Salonia "[e]xpert [w]itnesses" with "experience in video editing and graphic design"); *id.* at 10 (describing Exhibit J as "Expert Witness Testimony [of] Patricia Curcio"); *id.* at 11–12 (same for Salonia's testimony).)  However, at other times, Plaintiff explicitly states that these witnesses—or at least Curcio and Salonia—are *not* experts. (Spoliation Mot. 2 (stating that both Curcio and Salonia "*did not* form 'expert opinions'; however, they simply questioned the authenticity of the video because of obvious anomalies they saw while watching the video"); *id.* at 4 ("Several anomalies introduced in Ferro's report can be seen by *any* individual who views it, falling under 'common sense' and should raise question[s] [as to] to its authenticity without any expert determination."); Pl.'s Mem. 11 (stating that Curcio "advised  . . . Plaintiff to have it checked by an expert as she did not believe the video to be authentic" (alteration omitted)).)  To the extent these witnesses are *not* experts, but rather are providing only a "common sense" interpretation of the video, their opinions at most go to the weight of the evidence—i.e. the quality or credibility of the video—rather than its admissibility or authenticity for spoliation purposes.  However, to the extent Plaintiff attempts to introduce their opinions as expert ones, the evidence is excluded.

### i.  Rule 37(c)(1)

Defendant moves to exclude Ferro's report under Federal Rule of Civil Procedure 37(c). That rule provides, in relevant part:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1).[22]  When deciding a motion to exclude under this rule, the Court

"considers (1) the party's explanation for the failure to comply with the disclosure requirement;

(2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the

opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility

of a continuance." *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (alterations and

internal quotation marks omitted); *see also Mfon v. Cty. of Dutchess*, No. 17-790, 2018 WL

542586, at *2 (2d Cir. Jan. 25, 2018) (same).  And, "[s]ubstantial justification means justification

to a degree that could satisfy a reasonable person that parties could differ as to whether the party

was required to comply with the disclosure request." *Vioni v. Providence Inv. Mgmt., LLC*, No.

08-CV-2950, 2017 WL 881841, at *3 (S.D.N.Y. Mar. 6, 2017) (internal quotation marks

omitted).

The Case Management and Scheduling Order in this case required Plaintiff to make "[a]ll

expert disclosures, including reports" by April 14, 2017.  (Dkt. No. 149 (italics omitted).)  In her

Notice of Expert Witnesses filed in April 2017, Plaintiff listed Curcio and Salonia as witnesses

relating to other, non-video issues.  (Dkt. No. 156 ("Not. of Expert Witnesses").)  She also

stated:

> Plaintiff has not yet secured an expert witness for the video footage and intends to
> find an expert and have the video examined for authenticity.  There were issues
> with the initial video copy and Plaintiff had to wait for a copy that worked.

(*Id.*)  Plaintiff now claims that in March 2017, she submitted an Interrogatory Response stating

"her intent to use a Video Expert, therefore reserving her [r]ight" to secure one, and Defendant

did not object.  (Pl.'s Mem. 2–3 (alterations omitted).)  However, Plaintiff does not provide this

---

[22] Federal Rule of Civil Procedure 26(a) and (e) govern required disclosures and
supplementing disclosures and responses, respectively.

document or even a record citation to corroborate this fact. Plaintiff has also cited nothing in the record indicating she requested an extension of time to find an expert or that she amended or supplemented her interrogatory response. On June 19, 2017, the Court found discovery to be complete. (*See* Dkt. (entry for June 19, 2017).) Defendant filed her Motion for Summary Judgment on August 14, 2017. (Not. of Mot.) Plaintiff did not file her opposition to the Motion, and later her Spoliation Motion, until November 2017. (Pl.'s Mem.; Spoliation Mot.) She now claims that she found Ferro and requested she review the video in June 2017, but did not receive Ferro's report until October 2017. (Spoliation Mot. 2.)

As to the first *Patterson* factor—Plaintiff's explanation for the delay—Plaintiff argues that her failure to timely disclose Ferro as an expert was substantially justified. (Pl.'s Mem. 3.)[23] *See Patterson*, 440 F.3d at 117. Construing Plaintiff's submissions liberally, she provides three justifications: (1) she "was unable to retain a video expert or find a video expert that was willing to engage in court proceedings" until June 2017, when she found Ferro, and due to Ferro's personal issues, did not receive Ferro's report until October 2017, "a common timeline for expert analysis," (*id.* at 2); (2) she alerted Defendant that she intended to use a video expert, (*id.*; *see also* Spoliation Mot. 3); and (3) the original video file she received from Defendant was corrupted or could not be viewed, (Not. of Expert Witnesses; Spoliation Mot. 3). None of these reasons substantially justifies Plaintiff's failure to timely disclose Ferro as an expert.

---

[23] Plaintiff does not argue that her Rule 26 violation was harmless. *See* Fed. R. Civ. P. 37(c)(1). In any event, the cases finding such violations harmless are clearly distinguishable from this case. *See, e.g.*, *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, No. 16-CV-7634, 2017 WL 4334138, at *2 (S.D.N.Y. Sept. 28, 2017) ("But that violation was plainly harmless and thus not a basis for preclusion, . . . as Plaintiffs have indisputably known about [the expert] for months (and, on top of that, have been privy to [the expert's] direct testimony since July, when it was submitted in affidavit form in accordance with the Court's procedures).").

The first proffered justification is not valid for several reasons. First, the fact that Plaintiff could not find an expert willing to engage in litigation does not entitle her to violate a discovery scheduling order, nor does it explain why she did not request an extension of time. Second, even assuming the dubious proposition that an expert's alleged personal issues justify a delay in producing a report, Plaintiff knew of Ferro's existence and willingness to serve as an expert in June 2017, but did not disclose her identity to Defendant, request an extension of time for Ferro to prepare a report, or otherwise move to re-open discovery. Thus, her failure to disclose Ferro was not substantially justified. *See Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of New York & New Jersey*, No. 15-CV-3526, 2018 WL 485980, at *3 (S.D.N.Y. Jan. 19, 2018) (concluding that a party's failure to timely disclose its damages because the final computation was not ready was not a valid explanation because the party "still could have provided an estimate of the damages" on time); *Regalada v. Ecolab, Inc.*, No. 14-CV-6020, 2016 WL 94139, at *3 (S.D.N.Y. Jan. 7, 2016) (finding untimely expert disclosure not substantially justified because plaintiff's counsel "took no steps prior to the filing of the untimely expert disclosure to apprise the [c]ourt of its issues in meeting the expert deadlines"). Indeed, Plaintiff received an extension of time to file her opposition to the Summary Judgment Motion because she "objected to the timing and adequacy of [Defendant's] expert disclosures" and wanted "additional time to conduct investigation" of those experts, but failed to mention that Ferro was preparing an expert report. (Dkt. No. 184 (memo endorsement on letter from Defendant requesting extension); Letter from Plaintiff to Maj. Judge Davison (Aug. 18, 2017) (Dkt. No. 181) (claiming that Defendant's expert disclosures were made after the deadline set forth in the Case Management and Scheduling Order).) Instead, Plaintiff received an extension and filed an expert report to rebut Defendant's reliance on the video in her Motion for Summary Judgment—

timing which the Court finds suspiciously convenient.  *See Ebewo v. Martinez*, 309 F. Supp. 2d

600, 607 (S.D.N.Y. 2004) ("The plaintiff's delay . . . suggests that [it] came about as an effort to

refute the defendant's prima facie showing."); *F.D.I.C. v. Wrapwell Corp.*, No. 93-CV-859, 2000

WL 1576889, at *2 (S.D.N.Y. Oct. 23, 2000) (excluding defendant's expert witness that was

retained solely to refute evidence submitted in support of a motion for summary judgment).

Plaintiff's second argument—that she gave Defendant notice she would use an

unidentified video expert—also fails.  "Defendant[']s knowledge of the existence of a witness

does not satisfy the Rule 26(a)(1)(A) disclosure obligation; that obligation is fulfilled only if

Plaintiff[] informed Defendant[] that [she] might call the witness in support of [her] claims. . . .

The purpose of that requirement is to alert an opposing party of the need to take discovery of the

named witness. . . .  Plaintiff[']s late disclosure here deprived Defendant[] of the fair warning to

which [she was] entitled."  *Downey v. Adloox Inc.*, No. 16-CV-1689, 2018 WL 794592, at *1

(S.D.N.Y. Feb. 8, 2018) (alterations, citations, and internal quotation marks omitted).  Plaintiff

cites no law to the contrary.  Nor does she explain how the mere mention of a potential,

unidentified video expert in an interrogatory response in March, which she never followed up on

or supplemented before discovery closed, was sufficient notice to permit Defendant to engage in

discovery or somehow refute Ferro's report—particularly since Defendant had already filed her

Motion for Summary Judgment relying upon the video evidence.

Plaintiff's final explanation—that the original video file was corrupted—fares no better.

Plaintiff does not argue that she received a new, viewable copy of the video after the April 2017

disclosure deadline that would justify her belated decision to obtain, or disclose, an expert.

Indeed, Plaintiff requested a new copy of the video because she discovered the files were

corrupted in early March 2017, after she allegedly took the video to "a professional video

expert," (Pl.'s Ex. A (email from Plaintiff to counsel for Defendant on March 7, 2017)), and she received a second disc containing the requested video on March 15, 2017, (Pl.'s Mem. 2). Plaintiff also cites nothing in the record indicating she informed the Court of this problem and requested an extension because of it. Therefore, the fact that Plaintiff did not view an uncorrupted version of the video until mid-March of 2017, without requesting an extension of time, does not substantially justify her failure to disclose Ferro as an expert until November 2017—7 months after the deadline for expert disclosures and 2 months after Defendant filed her Summary Judgment Motion relying on the video evidence.

The other *Patterson* factors also weigh in favor of precluding Ferro's report. Although Ferro's testimony could be considered important in the sense that it undermines the credibility of the video evidence, it is not central to Plaintiff's claim. In any event, even if this factor weighs in Plaintiff's favor, the third and fourth factors weigh strongly in favor of preclusion. This case has been litigated since 2014, discovery has been closed for 8 months, and Defendant's Summary Judgment Motion was filed before Plaintiff submitted Ferro's report—and thus before Defendant could conduct discovery on Ferro—the Motion is now fully briefed, and the Parties already received an extension of time to complete expert discovery. (*See* Dkt. No. 158.) Therefore, the Court declines to reopen discovery and further delay this four-year-old case. *See Downey*, 2018 WL 794592, at *2 (declining to reopen discovery and grant a continuance because discovery was closed, the summary judgment was soon to be filed, it "would impose further litigation costs on [the defendants]," the case was over two years old, and the parties already received discovery extensions); *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 263 F. Supp. 3d 446, 452 (S.D.N.Y. 2017) ("Although a continuance would be possible, this case has been litigated since 2009, trial is now mere months away, and allowing deadlines to

continue to slip results in the backup of other cases and eventual scheduling chaos as a series of bottlenecks builds." (alteration and internal quotation marks omitted)).  The Court therefore will not consider Ferro's report in deciding the Motion for Summary Judgment.[24]

### ii.  Rule 702

Defendant also argues that Ferro, Curcio, and Salonia are all not qualified as experts under Federal Rule of Evidence 702.  (Def.'s Reply 3–4.)  That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R. Evid. 702.  The Court must first address "the threshold question of whether a witness is qualified as an expert by knowledge, skill, experience, training, or education to render his or her opinions."  *Nimely*, 414 F.3d at 396 n.11.  In doing this, the Court asks "whether the proffered expert has the educational background or training in a relevant field . . . by looking at the totality of the witness's background."  *Arista Records LLC v. Lime Grp. LLC*, No. 06-CV-5936, 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011) (citations and internal quotation marks omitted).  Then, the Court must "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony," to "ensure that the expert

---

[24] Even if the Court excused Plaintiff's disclosure violation, Ferro's report faces other evidentiary hurdles.  First, as discussed below, Ferro is not qualified to give an expert opinion regarding whether the video is doctored.  Second, Ferro's report is neither sworn nor signed under penalty of perjury, nor verified as true and correct.  *See Lamoureux v. AnazaoHealth Corp.*, No. 03-CV-1382, 2010 WL 4875870, at *2 (D. Conn. Nov. 18, 2010) (explaining this admissibility requirement).

will actually be testifying on issues or subject matters within his or her area of expertise." *Id.*

(alteration, citations, and internal quotation marks omitted). Courts in the Second Circuit

liberally construe the expert qualifications requirement, and generally will not exclude expert

testimony provided "the expert has educational and experiential qualifications in a general field

closely related to the subject matter in question." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp.

2d 230, 282 (E.D.N.Y. 2007).

Plaintiff has failed to establish that Ferro, Curcio, and Salonia are qualified as experts.

Ferro's qualifications are never listed—aside from being described as a "videographer,"

(Spoliation Mot. 2; Pl.'s Mem. 3), and indicating that she does photography for weddings in her

report letterhead, (Ferro Report), none of Plaintiff's submissions discuss Ferro's specialized

knowledge or experience in video editing or analysis, let alone provide her CV, such that the

Court could find her qualified based on her knowledge, skill, experience, training, or education.

*See Karavitis v. Makita U.S.A., Inc.*, 243 F. Supp. 3d 235, 242–43 (D. Conn. 2017), (holding that

the court could not conclude the proffered expert was qualified because his CV did not indicate

how he obtained his credentials or what he does that is relevant to the proffered area of

experience), *aff'd*, 2018 WL 627491 (2d Cir. Jan. 31, 2018)*; Arista Records LLC*, 2011 WL

1674796, at *5 (finding proposed expert not qualified because, although he "no doubt employed

statistics to some degree in his studies and work," the defendants failed to show his expertise on

statistical issues such that he would provide testimony helpful to the jury). Similarly, Plaintiff

provides almost no information about Curcio's and Salonia's knowledge, education, experience,

or skill with respect to video editing or analyzing videos for alteration. Instead, she states only

that they "have experience in video editing and graphic design," without listing such experience

or describing it in any meaningful detail. (Pl.'s Mem. 3; *see also id.* at 11 (noting Curcio's

"experience and knowledge in graphic design"); *id.* at 12 ("Salonia has also worked in video editing for a television show in the past and has experience in video editing."); Salonia Aff. 2 (noting his concerns about authenticity given "[his] experience and knowledge with video editing").) Indeed, Curcio states that she "ha[s] experience in graphic design," but that she "advised [Plaintiff] to have the video examined by someone in the field," implying she was *not* an expert in the field. (Curcio Aff. 4.) Therefore, because none of these witnesses is qualified as an expert, the Court will not consider their testimony as expert opinion regarding the authenticity or the video. *See, e.g.*, *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 638–40 (S.D.N.Y. 2016) (precluding expert at summary judgment because he was not qualified), *aff'd*, 2017 WL 6506353 (2d Cir. Dec. 20, 2017); *Fernandez v. Cent. Mine Equip. Co.*, 670 F. Supp. 2d 178, 183–85 (E.D.N.Y. 2009) (same); *cf. Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 532 (E.D.N.Y. 2012) (permitting expert to opine on authenticity of video because his opinion was qualified from experience analyzing videos produced by terrorist groups and based on a specified methodology).

### b. Spoliation[25]

Spoliation refers to "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

---

[25] At the outset, the Court notes that it is unclear if Plaintiff is even bringing a spoliation motion, as opposed to merely suggesting that there is "doubt" about the video's authenticity or that it is "extremely questionable." (Pl.'s Mem. 14.) Her concerns regarding the quality or credibility of the video are arguments about the weight to be afforded the evidence at trial, rather than proper grounds to conclude evidence was destroyed, lost, or significantly altered. And, these concerns are based on the opinions of her purported "experts," which the Court has precluded above. However, cognizant of Plaintiff's pro se status and construing her submissions to raise the strongest arguments possible, the Court will consider her submission as a Spoliation Motion.

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (internal quotation marks omitted). The Second Circuit has held that

> [a] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012) (internal quotation marks omitted). In determining whether records were destroyed "with a culpable state of mind," the Second Circuit has instructed that this element may be "satisfied by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) (alteration, italics, and internal quotation marks omitted).

On December 1, 2015, however, the new Fed. R. Civ. P. 37(e) went into effect. Pursuant to that provision:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > (A) presume that the lost information was unfavorable to the party;
> > >
> > > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> > >
> > > (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). While the Second Circuit has not yet published an opinion examining the impact of the new Rule 37(e), courts in the Second Circuit have recognized that Rule 37(e) replaces the prior framework for spoliation claims when electronically stored information is at issue. *See Leidig v. Buzzfeed, Inc.*, No. 16-CV-542, 2017 WL 6512353, at *7 (S.D.N.Y. Dec. 19, 2017) ("Rule 37(e) amended the traditional spoliation rules as it related to ESI in a number of ways—most significantly, by providing that the harsh sanctions listed in Rule 37(e)(2) were to be applied only in cases in which a party acted with 'intent to deprive' another of ESI."); *Citibank, N.A. v. Super Sayin' Publ'g, LLC*, No. 14-CV-5841, 2017 WL 462601, at *2 (S.D.N.Y. Jan. 17, 2017) ("[D]istrict courts in [the Second Circuit] ha[ve] already acknowledged that the December 1, 2015 amendment to Rule 37 has been interpreted as overruling the holding in *Residential Funding Corp.*" (internal quotation marks omitted)); *In re Bridge Constr. Servs. of Fla., Inc.*, 185 F. Supp. 3d 459, 472–73 (S.D.N.Y. 2016) ("The recent Amendments to Rule 37(e) of the Federal Rules of Civil Procedure have changed the rules relating to spoliation when it involves Electronically Stored Information ("ESI"). In particular, it overruled *Residential Funding* because no adverse inference instruction is available unless the proponent of the request for the instruction demonstrates that the party who destroyed the ESI acted with the intent to deprive another party of the information's use in the litigation."). Accordingly, litigants seeking an adverse inference for the destruction of electronically stored information face a tougher climb than in years past.[26]

---

[26] The Court notes that, although the Parties do not discuss this issue whatsoever, Rule 37(e)'s change is irrelevant if the surveillance video at issue does not constitute "electronically stored information." *Compare Wilder v. Rockdale Cty.*, No. 13-CV-2715, 2015 WL 1724596, at *3 (N.D. Ga. Apr. 15, 2015) (considering the old Fed. R. 37(e) in context of alleged spoliation of a jail cell surveillance video), and *Olson v. Sax*, No. 09-CV-823, 2010 WL 2639853, at *3 (E.D. Wis. June 25, 2010) ("[T]he only evidence before the [c]ourt indicates that the recording over of the video record from July 22, 2008, was part of [the defendant's] routine good faith operation of

Construing Plaintiff's Motion liberally, Plaintiff appears to be requesting an adverse inference, or even total exclusion, of the video. (Spoliation Mot. 3–4.) But, she has not produced *any* evidence that the video was significantly altered or that parts of it were destroyed. Instead, Plaintiff merely asserts that there are "anomalies" in the video, without identifying them, and that Defendant refused to provide her with the chain of custody for the videos, which somehow confirms they were altered. (*See* Spoliation Mot. 1–2 (alleging "several inaccuracies when compared to actual events"); Pl.'s Mem. 3 ("The Defense's refusal to produce sworn statements for Chain of Custody or even verbally assure/confirm authenticity only further asserts the video may altered or tampered with.").) However, Defendant submitted a sworn affidavit from the custodian of the Police Department's video surveillance records explaining the chain of custody for the video—namely, that daily recordings are automatically stored electronically on a network storage device, and no employee of the Police Department "has the ability to alter, modify or change" those recordings. (Def.'s Spoliation Opp. Ex. 1 (Affidavit of Kevin D. Keefe) ¶¶ 2–3).) Therefore, absent any evidence to rebut this affidavit, Plaintiff's Motion must be denied because there was no spoliation. *See Silano v. Wheeler*, No. 13-CV-185, 2015 WL 477179, at *2 n.4 (D. Conn. Feb. 5, 2015) ("[A]side from an unadorned statement that she has

---

its video system. . . . Therefore, pursuant to Rule 37(e) of the Federal Rules of Civil Procedure, the [c]ourt denies [the plaintiff's] motion for sanctions."), *with In re Kessler*, No. 05-CV-6056, 2009 WL 2603104, at *16 (E.D.N.Y. Mar. 27, 2009) (considering Rule 37(e) in context of automatically taped-over footage of a fire but indicating that it was "not applicable here"); *see also* Fed. R. Civ. P. 34(a) advisory committee's note to 2006 amendment (noting that "[t]he wide variety of computer systems currently in use, and the rapidity of technological change, counsel against a limiting or precise definition of electronically stored information," and that "[r]eferences elsewhere in the rules to 'electronically stored information' should be understood to invoke this expansive approach"). Because Plaintiff relies on the new Rule 37(e) in the Spoliation Motion, (Spoliation Mot. at 4), the Court will apply it here. However, even under the more lenient *Residential Funding* standard, Plaintiff has failed to show that the video was doctored "knowingly," "negligently," or even at all. 306 F.3d at 108.

'met with an expert who has rendered the preliminary opinion that the audio is not a genuine copy of the original,' [the plaintiff] provides no admissible evidence to support an attack on the recording's authenticity."); *Dilworth v. Goldberg*, 3 F. Supp. 3d 198, 203–04 (S.D.N.Y. 2014) (denying spoliation motion for jail surveillance video because the plaintiff's evidence was entirely hearsay in a memorandum, while the defendants submitted sworn affidavits); *Khaldei v. Kaspiev*, 961 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) ("[B]ecause [the] plaintiff's argument that there has been any actual loss of evidence relevant to the claims or defenses in this case amounts to pure speculation, it is insufficient to sustain a motion for spoliation sanctions."), *aff'd*, 961 F. Supp. 2d 572 (S.D.N.Y. 2013); *see also Byrnie*, 243 F.3d at 107 (defining spoliation as "the destruction or significant alteration of evidence").[27]

Plaintiff's also fails to satisfy Rule 37(e)(1), which requires a finding of "prejudice to another party from loss of the information," and limits the remedy to "measures no greater than necessary to cure the prejudice." Significant alteration of a video could, in some situations, be prejudicial to a plaintiff alleging excessive force—for example, if portions of the video showing

---

[27] Even assuming the video produced is missing some footage, Plaintiff has not argued, let alone provided evidence, that Defendant altered it "with the intent to deprive [her] of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). Rather, she asserts that Defendant has ignored her requests for evidence regarding the chain of custody of the video during discovery. (*See, e.g.*, Pl.'s Mem. 2; Spoliation Mot. 1–2.) That Plaintiff believes that Defendant's attorney's responses to her requests were inadequate, (*e.g.* Pl.'s Mem. 2 (finding insufficient an email from Defendant's counsel stating that "the CD disk you have been provided does depict the video footage in the Town's possession")), however, does not mean Defendant intentionally altered the video in order to deprive Plaintiff of other portions of it that she could use as evidence. *See Leidig*, 2017 WL 6512353, at *11 ("[T]he intent contemplated by Rule 37 is not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence."); *Int'l Bus. Machines Corp. v. Naganayagam*, No. 15-CV-7991, 2017 WL 5633165, at *6 (S.D.N.Y. Nov. 21, 2017) ("Even assuming that [the] [p]laintiff did fail to preserve relevant evidence, [the] [d]efendant merely alleges that [the] [p]laintiff acted negligently rather than intentionally . . . Accordingly, this Court finds that Defendant is not entitled to an adverse inference under Rule 37(e)." (citation omitted)).

the alleged use of force were omitted.  However, Plaintiff alleges no such altering—and thus, prejudice—here.  She asserts that the video is not authentic "because of obvious anomalies" and because it does not align with the "actual events" of March 17, 2014, but gives no details regarding what events or actions are missing or doctored in the video.  (Spoliation Mot. 2.)  The closest Plaintiff comes to identifying a problem with the video is her assertion that a "Police Log" shows "an eleven minute discrepancy from the video footage."  (Pl.'s Mem. 3 (citing Pl.'s Ex. O).)  Plaintiff does not state what this discrepancy is.  However, if it does not relate to the handcuffing incident relevant to Plaintiff's excessive force claim, it does not indicate significant alteration of the video that is prejudicial to Plaintiff.  Indeed, Plaintiff and many of her purported experts *rely* on the squad room video to argue that the force displayed was excessive, belying her claim that the video was prejudicially doctored.  (*See, e.g.*, Pl.'s Mem. 14 ("The Video Evidence . . . shows the twisting of . . . Plaintiff's arm/wrist and pain expressed on . . . Plaintiff's face along with . . . Plaintiff's peaceful cooperation with [Defendant]."); Letter from Plaintiff to Court (June 14, 2017) (Dkt. No. 163) ("Defense has submitted a video which . . . clearly shows the point of force . . ."); Curcio Aff. 3 (stating that, based on the video of the handcuffing, Defendant "did not use proper protocol to disengage handcuffs").)  *See Fabrikant v. French*, 691 F.3d 193, 201 n.6 (2d Cir. 2012) (relying on video evidence at summary judgment when the plaintiff did "not dispute" the video's authenticity but instead "dispute[d] only how to characterize that evidence").  Plaintiff also did not offer testimony at her deposition suggesting that Defendant took some action which is not portrayed on the video—the Parties merely disagree about how to interpret the force displayed.  And, had Plaintiff wished to clarify what was missing from the video that she previously testified to, she could have done so in her Witness Statement, but did not.  *See Jaffer v. Hirji*, No. 14-CV-2127, 2017 WL 1169665, at *6 (S.D.N.Y. Mar. 28, 2017)

(explaining that the plaintiffs could have clarified or supplemented the information in a recording "via affidavit," but instead did not discuss the recorded conversation, "thus begging the question of what [the] [p]laintiffs contend transpired during the conversation that was lost" in the produced recording). She also could have asked that the original video be made available to an actual expert.

Therefore, because Plaintiff has not shown that the video was altered at all, let alone that Defendant possessed an intent to deprive Plaintiff of information to which she is entitled or that she suffered any prejudice, the Spoliation Motion is denied.

### 2. Pat and Frisk Search Claim

Defendant argues that her pat down search of Plaintiff at James Baird State Park did not violate the Fourth Amendment. (Def.'s Mem. 8–11.) *See Graham v. Connor*, 490 U.S. 386, 394 (1989) (holding that search or excessive force claims "aris[ing] in the context of an arrest" fall under the Fourth Amendment, which protects against unreasonable searches and seizures of the person). The search of a person incident to an arrest is presumptively reasonable under the Fourth Amendment. *See United States v. Robinson*, 414 U.S. 218, 235 (1973). "Nevertheless, a search incident to a lawfully executed arrest may still violate the Fourth Amendment, if conducted in an otherwise unreasonable manner." *Wang v. Vahldieck*, No. 09-CV-3783, 2012 WL 119591, at *10 (E.D.N.Y. Jan. 9, 2012); *see also Mickle v. Morin*, 297 F.3d 114, 122 (2d Cir. 2002) ("[I]t [is] well established that the use of excessive force in the course of an arrest is constitutionally prohibited."); *Bolden v. Vill. of Monticello*, 344 F. Supp. 2d 407, 417 (S.D.N.Y. 2004) (noting "[a] lawful arrest . . . creates a presumption of reasonableness regarding an attendant search" that "can be rebutted by a showing that the search was conducted in an otherwise unreasonable manner"). For instance, "'unreasonable, non-consensual, inappropriate

touching' can constitute 'unreasonable intrusions into a plaintiff's bodily integrity in violation of the Fourth Amendment.'" *Golden v. Cty. of Westchester*, No. 10-CV-8933, 2012 WL 4327652, at *5 (S.D.N.Y. Sept. 18, 2012) (alterations omitted) (quoting *Fontana v. Raskin*, 262 F.3d 871, 880–81 (9th Cir. 2001)); *see also Anderson v. Waterbury Police Dep't*, No. 14-CV-829, 2017 WL 1157843, at *11 (D. Conn. Mar. 28, 2017) ("[C]ourts in [the Second] Circuit have found that claims that police officer's actions during and following the arrest of a suspect rise to the level of a sexual assault are properly analyzed under the Fourth Amendment and could give rise to at least one genuine issue of material fact that precludes summary judgment on the Fourth Amendment claim." (internal quotation marks omitted)). However, "not every truthful allegation of sexual bodily intrusion during an arrest is actionable as a violation of the Fourth Amendment. Some bodily intrusions may be provably accidental or de minimis and thus constitutionally reasonable." *Fontana*, 262 F.3d at 880 (italics omitted); *Wright v. City of Waterbury*, No. 07-CV-306, 2011 WL 1106217, at *6 (D. Conn. Mar. 23, 2011) (same).

Construing the evidence in the light most favorable to Plaintiff, and even assuming Defendant *did* make contact with Plaintiff's breasts and groin area, (*contra* Amorim Aff. ¶¶ 14–15), the evidence shows that Defendant (1) touched Plaintiff's breasts over Plaintiff's shirt, (*see* Amorim Aff. ¶ 15 (averring that Defendant slid hands along Plaintiff's bra line, but did not reach under the bra); Pl.'s Dep. 63–64 (testifying that Defendant "went inside [Plaintiff's] bra, but through [her] clothing . . . on both breasts" and "was trying to feel if there was anything inside [the] bra")), and (2) hit or touched Plaintiff's genital area while patting the side of Plaintiff's legs over her pants, (*see* Pl.'s Dep. 63 (testifying that Defendant "went down [Plaintiff's] legs and then brought her hand back up and that is when she hit [Plaintiff] forcefully in the genital area"); *id.* at 65 (testifying that the 'hit' caused her to "flinch[]"); *id.* at 66 (testifying that she felt, but

could not see, a "touch" to her genital area)). And, it is undisputed that the entire pat-down search including this touching lasted "just several seconds." (Def.'s 56.1 ¶ 25.) Courts in the Second Circuit have consistently held that such brief contact with an arrestee's breasts or genital area during a pat-down, without more, is insufficient to violate the Fourth Amendment. *See Lamore v. Vermont*, No. 12-CV-59, 2013 WL 3560969, at *4 (D. Vt. July 11, 2013) (finding that a pat-down search which "involved contact with [the plaintiff's] genitals" did "not rise to the level of a Fourth Amendment claim"); *Pascual v. Fernandez*, No. 11-CV-7075, 2013 WL 474292, at *6 (S.D.N.Y. Jan. 29, 2013) (finding pat-down of female arrestee's breasts, buttocks, and inner thigh area over her clothing by a male officer not constitutionally unreasonable, in part because those "are precisely the areas that it would be reasonable for an officer to touch in the course of a search"); *Golden*, 2012 WL 4327652, at *6 (granting summary judgment on Fourth Amendment claim where the officer's search "was a minimally intrusive, above the clothing-pat down," even though it "included incidental contact with [the plaintiff's] breasts and genital area" that Plaintiff described as "touch[ing]"); *Wright*, 2011 WL 1106217, at *7 (finding that the police officer who "cupped [the plaintiff's] groin area, while she was frisking him, on two occasions" did "not rise to the level of unreasonableness required for a Fourth Amendment violation" because the officer "did not grab [the plaintiff's] groin area or touch underneath his clothing, and the search of [the] groin area was extremely quick"); *Burke v. Cicero Police Dep't*, No. 07-CV-624, 2010 WL 1235411, at *7 (N.D.N.Y. Mar. 31, 2010) (noting that claim that the officer, during a search incident to an arrest, "was patting and squeezing [the plaintiff's] legs and doing the same from [her] breasts on down" would be lawful if the initial arrest was lawful (internal quotation marks omitted)); *Garcia v. New York State Police Investigator Aguiar*, 138 F. Supp. 2d 298, 304 (N.D.N.Y. 2001) (dismissing Fourth Amendment claim where the plaintiff

alleged that the officer "cupped her crotch and breasts" because the plaintiff admitted that the defendant "was not groping her in a sexual manner, he did not grab her crotch or breasts, he did not touch underneath her clothing, and the search of each area was fairly quick"); *id.* (noting that searching "the crotch area, pockets, and the legs," along with "cleavage and under each breast" is reasonable). "Indeed, the Supreme Court has long recognized that a search of a suspect may consist of 'a careful exploration of the outer surfaces of a person's clothing all over his or her body . . . including . . . wasteline [sic] and back, the groin area about the testicles, and entire surface of the legs down to the feet.' The [Supreme Court] also acknowledged that such searches may be 'humiliating.'" *Lamore*, 2013 WL 3560969, at *4 (quoting *Terry v. Ohio*, 392 U.S. 1, 16, 17 n.13, 25 (1968)). This makes sense in light of the undisputed purpose of searches incident to arrest, including the one that took place here—to check for weapons or other concealed safety risks. (*E.g.*, Seresky Aff. ¶ 7.)

There is no evidence in the record that Defendant's search exceeded these bounds. For example, Plaintiff does not contend that Defendant grabbed or squeezed Plaintiff's breasts or genital area, or that she touched these body parts for more than a few seconds while conducting the pat down search.[28] Nor did Defendant make inappropriate sexual remarks while conducting

---

[28] In her affidavit, Curcio opines on the propriety of Defendant's pat down search. (*See* Curcio Aff.) She appears to have written this affidavit after reading the Amended Complaint, which she parrots when describing the facts in this case. (*E.g.*, *id.* at 5 (describing search as "rough and excessive" and referring to the "menstrual blood").) In any event, the affidavit is not relevant to analyzing Plaintiff's unreasonable search claim. First, putting aside whether Curcio may offer an opinion about whether the search was legal, or is a qualified expert on pat down searches, both dubious propositions, she notes only that the search may have violated police protocol, rather than the Fourth Amendment. (*Id.* at 7 ("It is my professional opinion that proper procedures were *not* followed.").) Second, Curcio incorrectly describes Plaintiff's claim as about Defendant "squeez[ing] breast(s) or plac[ing] hands inside of under garments." (*Id.* at 6.) Third, her opinion rests largely on Defendant's failure to provide Plaintiff with a sanitary napkin or medical attention—claims that were dismissed at the Motion to Dismiss stage. (Order & Op. (Dkt. No. 129) 26–29.) To the extent that Curcio opines that it is never acceptable to make

the search.  (Amorim Aff. ¶ 16.)  *Cf. Fontana*, 262 F.3d at 881 (finding the defendant's

"purposeful sexual verbal and physical predation against a handcuffed arrestee" to violate the

Fourth Amendment); *Love v. Town of Granby*, No. 03-CV-1960, 2004 WL 1683159, at *5–6 (D.

Conn. July 12, 2004) (denying summary judgment where the defendant "grabbed [the plaintiff's]

scrotum and said, 'You haven't felt like this in a long time, you faggot.").  Even if, construing

the evidence in the light most favorable to Plaintiff, Defendant "hit" Plaintiff's genital area, this

"hit" was—by Plaintiff's own account—no more than brief contact with Plaintiff's genital area,

also referred to as a "touch," and occurred during a legitimate pat down, while Defendant went

up both sides of Plaintiff's clothed legs and back down.  (Pl.'s Dep. 65–66.)  Indeed, Plaintiff

concedes that she did not request medical attention or say she was in pain or discomfort

immediately after the search.  (Def.'s 56.1 ¶¶ 26–27.)  Therefore, the mere fact that Plaintiff used

the words "hit" and "forcefully" at her deposition, without providing any factual detail, is alone

insufficient to create a dispute of fact regarding the reasonableness of Defendant's contact with

her genital area.  *See Tabbaa v. Chertoff*, No. 05-CV-582S, 2005 WL 3531828, at *12

(W.D.N.Y. Dec. 22, 2005), *aff'd*, 509 F.3d 89 (2d Cir. 2007) (concluding that a factual dispute

regarding "the level of force used . . . to complete the pat-downs" did "not preclude summary

judgment because even assuming that some force was used . . . kicking [the] [p]laintiffs' feet

apart to properly position them for a pat-down search does not rise to the level of physical

invasiveness to render the entire search non-routine"); *Friedman v. Young*, 702 F. Supp. 433, 438

(S.D.N.Y. 1988) ("Assuming his pat-down included touching [the plaintiff's] genitalia while

conducting the search, such conduct is not unreasonable in the absence of any showing of

---

contact with an arrestee's genital area during a pat down search, (*see* Curcio Aff. 5), this opinion
is at odds with the previously discussed precedent.

excessive force. His conduct was at all times reasonable."); *cf. Shannon v Venettozzi*, 670 F. App'x 29, 31 (2d Cir. 2016) (vacating dismissal of Eighth Amendment claims regarding forceful pat-frisk searches where the defendant "hit [the plaintiff's] genitalia hard, rammed his hands into [the plaintiff]'s testicles very hand, fondled [the plaintiff's] genitals, and rubbed his buttocks." (alterations and internal quotation marks omitted)).

To the extent Plaintiff alleges that the "hit" to her genital area constituted excessive force in violation of the Fourth Amendment, that claim fails for a similar reason—Plaintiff has not produced evidence "that the alleged use of force was serious or harmful enough to be actionable." *Ferebee v. City of New York*, No. 15-CV-1868, 2017 WL 2930587, at *8 (S.D.N.Y. July 6, 2017), *reconsideration denied*, 2017 WL 3208602 (S.D.N.Y. July 27, 2017), *and appeal withdrawn*, No. 17-2414, 2017 WL 7361167 (2d Cir. Nov. 9, 2017). "A de minimis use of force will rarely suffice to state a constitutional claim, and de minimis injury can serve as conclusive evidence that de minimis force was used." *Id.* at *8 (citations and internal quotation marks omitted); *see also Cunninham v. New York City*, No. 04-CV-10232, 2007 WL 2743580, at *6 (S.D.N.Y. Sept. 18, 2007) (same). Considering the totality of the circumstances, and viewing the evidence in the light most favorable to Plaintiff, Defendant's use of force here was not objectively unreasonable. *See Graham*, 490 U.S. at 394–96 (explaining Fourth Amendment excessive force standard, which requires the Court to evaluate "the facts and circumstances of each particular case"). The only purported use of force here—a "hit" or "touch" to Plaintiff's genital area lasting at most a few seconds, during an undisputedly legitimate pat down incident to arrest to search for weapons or contraband—was not excessive.[29] *See Rodriguez v Vill. of*

_____

[29] The hit was likely even less than a few seconds, given that it is undisputed that the whole *search* lasted "just several seconds." (Def.'s 56.1 ¶ 25.)

*Ossining*, 918 F. Supp. 2d 230, 238–39 (S.D.N.Y. 2013) (noting that the plaintiff did not contest the legitimacy of her arrest or search incident to it, and finding use of force to be de minimis where the defendant "grab[bed] [the] [p]laintiff's arm to remove her from the car . . . to effect her arrest" and the plaintiff did not suffer a "painful or serious" injury); *Hodge v. Vill. of Southampton*, 838 F. Supp. 2d 67, 75–76 (E.D.N.Y. 2012) (listing cases where the force used was de minimis); *see also Nolin v. Isbell*, 207 F.3d 1253, 1258 n.4 (11th Cir. 2000) (finding the defendant's "search[] [of] [the plaintiff's] groin area in an uncomfortable manner," in addition to other uses of force, was "little different from the minimal amount of force and injury involved in a typical arrest"); *Bryan v. Spillman*, No. 05-CV-94, 2006 WL 1793544, at *6–7 (M.D. Fla. June 28, 2006) (finding a "rough search of [the] [p]laintiff's genitals" to be de minimis force, although also noting lack of injury), *aff'd*, 217 F. App'x 882 (11th Cir. 2007); *Allmond v. Alexandria Sheriff's Dept.*, No. 02-CV-309, 2002 WL 32514956, at *3 (E.D. Va. June 4, 2002) (holding that the plaintiff's excessive force claim, based on the officer's "manual search of [the] plaintiff's groin area with the back of his hand coming into contact with [the] plaintiff's genitals," failed because the search was reasonable under the Fourth Amendment). This is not a case in which Defendant intentionally or gratuitously inflicted pain or in which the force used was disproportionate to the threat posed. *See, e.g.*, *Porath v. Bird*, No. 11-CV-963, 2013 WL 2418253, at *18 (N.D.N.Y. June 3, 2013) (explaining that cases in the Second Circuit "recognize that intentional, gratuitous uses of force that are not required to subdue an individual likely fail the *Graham* objective reasonableness test"); *cf. Phelan v. Sullivan*, 541 F. App'x 21, 24 (2d Cir. 2013) (reversing district court's entry of summary judgment in favor of defendants on excessive force claim where the plaintiff alleged that the defendants "punched, kicked, and beat him while effecting his arrest, and . . . nearly broke his arm"); *Amnesty America v. Town of W. Hartford*,

361 F.3d 113, 123–24 (2d Cir. 2004) (denying summary judgment where the officers pulled the plaintiffs' wrists to "cause[] lasting damage," threw or dragged them "face-down," "plac[ed] a knee on [one plaintiff's] neck in order to tighten his handcuffs while he was lying face-down," and "ram[med] [that plaintiff's] head into a wall at high speed"); *Vasquez-Sanchez v. Pruitt*, No. 09-CV-5105, 2010 WL 3761451, at *11 (W.D. Ark. Aug. 24, 2010), *adopted by* 2010 WL 3747135 (W.D. Ark. Sept. 20, 2010) (denying summary judgment on excessive force claim where the plaintiff, a pre-trial detainee, "alleged that [the defendant] struck him so hard in the testicles that his testicles were swollen and he was urinating blood," and "[t]o this day, [the] [p]laintiff maintains he suffers from pain in his testicular area and has blood in his urine"). Indeed, Plaintiff admits she did not see Defendant's movements during the pat down, but instead only felt a touch to her genital area when Defendant "went up" her pant legs. (Pl.'s Dep. 66; *see also* Witness Statement 1 ("I was hit in the genital area during . . . Defendant[']s search.").)[30] Therefore, her excessive force claim fails.[31]

---

[30] Curiously, Plaintiff urges the Court to reject Officer Seresky's affidavit on the grounds that he could not view Defendant's movement during the pat down search. (Pl.'s Mem. 4.)

[31] Although not necessary to the Court's decision, Plaintiff also likely suffered only a de minimis *injury*. The only potential injuries from the alleged "hit" to her genital area were bleeding and vaginitis. As to the former, Plaintiff has provided no evidence that this bleeding was *caused by* the hit to her genital area. Indeed, her Amended Complaint alleged that the bleeding was "evidence of menstrual cycle happening," (Am. Compl. ¶ 69), which is what the contemporaneous medical records show, (Def.'s Ex. M at 11 (Emergency Visit Note stating that Plaintiff informed doctors she "was not given . . . [a] tampon or pad for her period and use[d] a gene[ric] [paper] for her vaginal bleeding")). However, even assuming that the hit caused the bleeding, (*e.g.* Witness Statement 1), that injury was temporary and resolved with toilet paper. Indeed, Plaintiff did not claim she was in pain or that she requested medical attention immediately after the search or during the drive to the police station. (Def.'s 56.1 ¶¶ 26–27, 30.) When Plaintiff went to the hospital the next day, she did not complain of injury from force; rather, she told hospital personnel that she had used toilet paper instead of a sanitary napkin, and was informed that this caused her vaginitis. (*See id.* ¶ 42; Pl.'s Ex. I at 2, 4; Pl.'s Dep. 91.) Indeed, the examining physician identified "[n]o evidence of trauma." (Def.'s Ex. M. at 12 ("Emergency Visit Note").) Plaintiff's vaginitis cleared up in two days, (Def.'s 56.1 ¶ 46), and she was not diagnosed with or treated for any other vaginal injuries, (*id.* ¶¶ 45, 47). Thus,

The Court thus concludes that Defendant is entitled to summary judgment on the claim relating to the pat down search.

### 3. Removal of Handcuffs Claim

Defendant argues that she did not use excessive force in removing Plaintiff's handcuffs at the Police Department, because any force used was de minimis and Plaintiff did not suffer sufficiently severe injuries. (Def.'s Mem. 11–14.) This claim is analyzed under the same Fourth Amendment excessive force standard described above. *See Graham*, 490 U.S. at 394–96 (describing objective reasonableness test); *Ferebee*, 2017 WL 2930587, at *7–8 (requiring more than de minimis use of force). In applying this standard, courts recognize that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal quotation marks omitted).

The Parties do not dispute many of the relevant facts. Both agree that Defendant initially removed Plaintiff's right handcuff and asked Plaintiff to put her right hand on top of her head while Defendant removed the left handcuff. (Amorim Aff. ¶ 20; Pl.'s Dep. 75.) And, although

---

Plaintiff's minimal and transient injuries are insufficient to demonstrate excessive force. *See, e.g., Quon v. Henry*, No. 14-CV-9909, 2017 WL 1406279, at *10 (S.D.N.Y. Mar. 27, 2017) (collecting cases and concluding that the plaintiff suffered only a de minimis injury because he did not initially complain of pain, had only "slight redness and swelling" at the hospital, did not substantiate his claim that his injury was caused by defendant "with any medical evidence," and showed no permanent damage); *White v. Williams*, No. 12-CV-1775, 2016 WL 4006461, at *9 (N.D.N.Y. June 22, 2016) (finding de minimis use of force where officer "struck [the] [p]laintiff in the face," in part because, the plaintiff's "claim that he was bleeding profusely as a result of the strike [was] . . . belied by the medical records"); *Adilovic v. County of Westchester*, No. 08-CV-10971, 2011 WL 2893101, at *7 (S.D.N.Y. July 14, 2011) (granting summary judgment on excessive force claim where the plaintiff's claim that he suffered a forceful beating was "uncorroborated" and the hospital records did not show severe injuries); *see also Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1008 (8th Cir. 2003) (concluding that "no reasonable jury could have found the police officer used excessive force in securing the handcuffs" because, although the plaintiff claimed "her handcuffs were secured so tightly they made one of her hands bleed," she "did not allege, or present any medical records indicating she suffered any long-term or permanent physical injury").

they use different language, both Plaintiff and Defendant agree that Defendant then extended

Plaintiff's left arm up to the side and up so that Defendant could remove the left handcuff, which

she was having trouble removing. (*Compare* Amorim Aff. ¶ 21 ("I extended . . . [P]laintiff's left

arm to her side to remove the . . . left handcuff. I extended . . . [P]laintiff's left arm up and to the

side so that I could more easily access and visualize the keyhole of the handcuff.") *with* Pl.'s

Dep. 75 ("[Defendant] seemed like she was having a hard time getting the handcuffs off. . . . She

took my left hand and twisted it and brought it up to the side.") *and* Witness Statement 2

("Defendant did twist the arm to the side and up.").) This description comports with the video,

which shows that the entire left handcuff removal lasted approximately 12 seconds. (*See* Squad

Rm. Cam. at 3:42:16–3:42:28 pm.)[32] Plaintiff also claims that she screamed "you're breaking

my arm," but Defendant "told [her] to stand still and don't move" and kept Plaintiff's "hand up

in the air in an unnatural position," causing Plaintiff pain. (Pl.'s Dep. 75; *see also* Witness

Statement 2 (same).) By contrast, Defendant contends that Plaintiff "did not, at any time,

complain to [her] of any pain in her left shoulder." (Amorim Aff. ¶ 22.) The video cannot fully

resolve this factual dispute, because it has no sound, does not clearly show whether Plaintiff is

speaking towards the end of the handcuff removal, and Defendant's back is facing the camera

during part of the relevant time. (*See* Squad Rm. Cam. at 3:42:16–3:42:28 pm.) It *is* clear,

however, that Plaintiff exclaimed something at 3:42:16 pm—when her arm was first raised—and

---

[32] To the extent that Plaintiff now claims, for the first time in her opposition to the Motion, that Defendant twisted her arm all the way "behind [her] back," (Witness Statement 2), that claim is flatly contradicted by the video. *See Scott*, 550 U.S. at 378–81 (concluding that video evidence can be considered at summary judgment and may be credited over a non-movant's account if it is so "blatantly contradicted by [the video] . . . that no reasonable jury could believe [the non-movant's account]").

then grimaced at 3:42:18 pm, while her arm was still up, facing Defendant. (Squad Rm. Cam. at 3:42:16–3:42:18 pm.)

In any event, this dispute is not material, because, even assuming that Plaintiff cried out in pain and that Defendant kept her arm up anyway to remove the handcuff, this use of force was not excessive. [33] It is undisputed that Defendant was attempting to remove Plaintiff's handcuffs and had difficulty with the left one, requiring her to move the keyhole closer to her face. Importantly, Plaintiff does *not* dispute that Defendant needed to turn Plaintiff's arm this way in order to remove the left handcuff. *See, e.g.*, *Miller v. Clarke*, No. 14-CV-978, 2016 WL 6471041, at *4 (E.D. Va. Oct. 26, 2016), *aff'd*, 678 F. App'x 135 (4th Cir. 2017) ("[The] [p]laintiff's own admissions actually weaken his Eighth Amendment claim against [the defendant]. . . . Plaintiff admits that [the defendant] was having difficulty in removing the handcuffs, and as a result [the defendant] had to tug and pull on the cuffs, which caused pain to plaintiff. . . . Hence, [the defendant] used only the minimal amount of force necessary to maintain control over plaintiff and to effectively remove his handcuffs, and he is entitled to summary judgment on plaintiff's Eighth Amendment claim." (citations omitted)); *Langley v. Bowman*, No. 16-CV-1607, 2016 WL 6477036, at *8 (E.D. La. Aug. 8, 2016) (finding that the plaintiff failed to state an Eighth Amendment claim because the plaintiff "testified that the officers tried to remove the handcuffs with a key, but were having trouble removing one handcuff because the key would not work," and thus "twist[ing] plaintiff's arm and pull[ing] the restraint off" was "only the force necessary to the circumstances"), *adopted by* 2016 WL 6441288 (E.D. La. Nov. 1, 2016); *Taylor v. Spitzer*, No. 10-CV-9, 2011 WL 5827794, at *4

---

[33] Neither Party cites cases involving Fourth Amendment excessive force claims related to the *removal* of handcuffs. The Court was unable to find any such cases in the Second Circuit.

(E.D. Mo. Nov. 18, 2011) (granting summary judgment on Eighth Amendment excessive force claim because the plaintiff "did not contest that neither [of the defendants] applied any force other than what was necessary to gain control of plaintiff's legs . . . and remove plaintiff's restraints"); *cf. Jones v. Swarthout*, No. 14-CV-01372, 2017 WL 4284660, at *7 (E.D. Cal. Sept. 27, 2017) (denying summary judgment on Eighth Amendment excessive force claim because the plaintiff disputed whether the defendant "was required to bend [his] wrists and arms in order to remove the handcuffs" rather than do so "in a less painful way"), *adopted by* 2018 WL 619591 (E.D. Cal. Jan. 30, 2018).  And indeed, when Plaintiff allegedly screamed out because this hurt her shoulder, Defendant told her to "stand still" and stop moving, demonstrating an effort to minimize the force used.  *Cf. Cunningham v. Lewis*, No. 15-CV-619, 2017 WL 3473835, at *4 (S.D. Ill. Aug. 11, 2017) (explaining that the plaintiff "testified that [the] [d]efendants did not issue any orders to him with respect to handcuff removal, which suggests that [they] made no efforts to temper the severity of the force used"), *reconsideration denied*, 2017 WL 4882337 (S.D. Ill. Oct. 30, 2017).[34]  Instead, Plaintiff testified that Defendant "was having a hard time getting the handcuffs off" and thus twisted Plaintiff's arm "in an unnatural position," causing Plaintiff pain.  (Pl.'s Dep. 75).  Courts in the Second Circuit have found similar lifting of an arrestee's arms—albeit in the context of putting on, not removing, handcuffs—to be de minimis

---

[34] The Court acknowledges that the above out-of-circuit cases involve claims under the Eighth, rather than the Fourth, Amendment.  However, Fourth Amendment claims also require the Court to ask whether more force than necessary was used.  *See Graham*, 490 U.S. at 396 (explaining that seizures necessarily require "the right to use some degree of physical coercion or that hereof to effect it," and that the amount of force used in proportion to the situation is relevant in assessing its reasonableness); *see also Tyk v. Surat*, 675 F. App'x 40, 42 (2d Cir. 2017) ("[The plaintiff's] [Fourth Amendment] excessive force claim fails because he does not show that [the defendant] used any degree of force that was more than necessary to effect a lawful arrest. . . . [The plaintiff] offered no . . . admissible evidence that [the defendant] used an unreasonable degree of force in handcuffing [the plaintiff].").  Therefore, the thesis of these Eighth Amendment cases still applies here.

use of force. *See, e.g.*, *Ferebee*, 2017 WL 2930587, at *8 ("Merely lifting the arms of a handcuffed arrestee is not an unreasonable use of force."); *Vogeler v. Colbath*, No. 04-CV-6071, 2005 WL 2482549, at *9–10 (S.D.N.Y. Oct. 6, 2005) (granting summary judgment on claim that the plaintiffs "were lifted and dragged off the ground by their arms" while handcuffed behind their backs because the plaintiffs "failed to show that such action was any more than de minimis force" under the circumstances—an arrest following a drug raid); *Perlleshi v. Cty. of Westchester*, No. 98-CV-6927, 2000 WL 554294, at *6 (S.D.N.Y. Apr. 24, 2000) ("Cuffing an arrestee and raising his arms to do it in a way that may cause momentary pain . . . is not excessive force as a matter of law.").

Moreover, Plaintiff's arm was lifted for no more than 15 seconds to accomplish this task, belying a claim that it was excessive. *See Langley*, 2016 WL 6477036, at *3, *8 (finding defendants' twisting of the plaintiff's arm to remove the second handcuff for "five to ten minutes," even while "intentionally block[ing]" the camera "so that the incident would not be filmed," was "a limited and minimal use of force"); *Small v. Moore*, No. 07-CV-200, 2009 WL 1605369, at *5–6 (N.D. Fla. June 5, 2009) (noting that the video "show[ed] that [the] plaintiff's handcuffs were removed in approximately 1 minute without the exertion of any force"); *see also Graham*, 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). Even assuming Plaintiff cried out in pain but Defendant continued to try to remove the handcuff for several more seconds, Plaintiff provides no evidence that Defendant could have removed the handcuff earlier but intentionally prolonged this process, or that she gratuitously inflicted pain by twisting Plaintiff's arm more than necessary. *See Porath*, 2013 WL

2418253, at *18 (explaining that cases in the Second Circuit "recognize that intentional, gratuitous uses of force that are not required to subdue an individual likely fail the *Graham* objective reasonableness test"); *Johnson v. City of New York*, No. 05-CV-2357, 2006 WL 2354815, at *5 (S.D.N.Y. Aug. 14, 2006) ("There surely would be no objective need to 'stomp' and 'kick' an individual already under police control. Such gratuitous force-if true-would be actionable under the case law."); *cf. Amnesty America*, 361 F.3d at 123–24 (denying summary judgment where the officers pulled the plaintiffs' wrists to "cause[] lasting damage," among many other uses of force); *Fennell v Quintela*, 393 F. App'x 150, 152, 156 (5th Cir. 2010) (per curiam) (denying summary judgment where the plaintiff was "already behind bars in the segregation shower" and "did not provoke the officers," but the officer still "grabbed his wrists and twisted them" to remove his handcuffs); *Sharnick v. D'Archangelo*, 935 F. Supp. 2d 436, 447 (D. Conn. 2013) (denying summary judgment because "a rational jury could certainly find that [the defendant] used excessive force when he . . . did not stop the police cruiser when [the plaintiff] 'cried out' in pain" from overly tight handcuffs). Indeed, while evidence that Plaintiff informed Defendant of her prior shoulder injury would create a factual dispute regarding whether Defendant's actions were gratuitous or objectively unreasonable, no such evidence exists in this record. *See, e.g.*, *Sanchez v. Port Auth. of New York & New Jersey*, No. 08-CV-1028, 2012 WL 1068078, at *10 (E.D.N.Y. Mar. 29, 2012) (finding handcuffing of arrestee objectively reasonable "[i]n light of the extremely brief nature of the restraint" and only "vague testimony of the officer's knowledge of [the] plaintiff's prior injury"); *see also Kalfus v. New York & Presbyterian Hosp.*, 476 F. App'x 877, 881 (2d Cir. 2012) ("Because the patrolmen had no reason to know that [the plaintiff's] existing shoulder injury might be aggravated if his arms were pulled or he were handcuffed, the amount of force that they used . . . could not be deemed

objectively 'unreasonable' by any reasonable jury." (italics omitted)).  Therefore, Defendant's use of force was not excessive.[35]

Although the Court need not address Plaintiff's injuries, they further undermine her excessive force claim.  *See Ferebee*, 2017 WL 2930587, at *8 (explaining that a "de minimis injury can serve as conclusive evidence that de minimis force was used" (italics omitted)). Plaintiff was handcuffed behind her back for approximately an hour before her arrest, (Pl.'s Dep. 58 (handcuffing by Seresky); Def.'s 56.1 ¶ 28 (handcuffing by Defendant)), and again after she was transferred from the Police Department to her court appearance, (Pl.'s Dep. 79, 81; Squad Rm. Cam. at 5:27:03–5:27:38 pm), and her left hand was handcuffed to the bench in her holding cell for an extended period of time, (Detention Cam. 3:44:38–4:33:17 pm; *id.* at 4:37:32–5:20:28).  Plaintiff does not dispute Dr. Weiner's opinion that being handcuffed this way for extended periods of time can cause "short-term discomfort or pain" to the shoulder.  (Weiner Aff. ¶ 8 n.2.)  Indeed, she has admitted this caused her pain, in both the Amended Complaint, (Am. Compl. ¶ 57 (alleging that her "shoulders were locked/frozen" from being handcuffed and moving her arm up therefore caused "pain")), and to hospital personnel, (Pl.'s Ex. H. at 3 (St. Luke's Cornwall Hospital Emergency Room Note stating her pain was caused by being "transported for several hours [with] her hands behind her back")).  Moreover, after the handcuff removal incident, Plaintiff was able to remove her shoes and put them back on again, along with

---

[35] To the extent that Curcio opines otherwise in her affidavit, it does not change the Court's analysis.  First, Curcio concedes that "[i]t is impossible to determine by the video the amount of force used by the officer."  (Curcio Aff. 3.)  Second, she states that Defendant "did not use proper protocol to disengage handcuffs," which, even if true, is not relevant to whether the *force* used was objectively unreasonable.  (*Id.*)  Third, even assuming that she is an "expert" in handcuffing protocol, which she is not, Curcio may not provide an opinion in the form of a legal conclusion that "excessive force" was used.  (*Id.*)  *See Nimely*, 414 F.3d at 397 (explaining that expert testimony must "assist the trier of fact," and it does not do so if "undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's").

her belt.  (Squad Rm. Cam. at 3:44:22–3:44:36 pm; *id.* at 5:20:31–5:21:05 pm.)  Plaintiff did not

complain of shoulder pain or request medical attention during this remaining time at the Police

Department.  (Amorim Aff. ¶ 22.)  Indeed, at no point in any of the videos after the handcuff

removal is Plaintiff shown holding her arm or otherwise in visible pain.

Furthermore, Plaintiff's shoulder x-rays showed no fractures, breaks, or dislocations.

(Def.'s 56.1 ¶ 49; Pl.'s Ex. G at 4.)  Instead, orthopedic specialists suggested it was some sort of

"rupture," but Plaintiff never got an MRI or attended physical therapy as instructed.  (Witness

Statement 4.)  Dr. Weiner opined that Plaintiff has "[left] shoulder arthralgia," meaning "minor

restrictions to range of motion," because of her 1996 motorcycle accident injury, *not* the removal

of her handcuffs.  (Weiner Report 5.)  Plaintiff admits that this accident "impacted" her left

shoulder and fractured her upper arm, but she never sought treatment.  (Pl.'s Dep. 32–35.)

Although Plaintiff also contends that she was still able to perform work without physical

limitations after the 1996 accident, (Witness Statement 5), but could not complete a construction

project in May 2017, after the handcuffing incident, (*id.*), she also testified that, prior to March

2017, she did not experience any serious pain and sought no work, (Pl.'s Dep. 114–15 (testifying

only that her shoulder sometimes "gets achy" when the weather changes)).  In any event,

although Plaintiff disagrees with Dr. Weiner's opinion, (Pl.'s Mem. 4–5), she provides no

medical evidence refuting his testimony that the removal of Plaintiff's handcuffs could not have

caused a structural injury to her left shoulder, (Weiner Report 5 ("It is my professional opinion,

within a reasonable degree of medical certainty, that there is no evidence to support any claim

for a structural injury to the left upper extremity as a consequence of the removal of her

handcuffs on March 17, 2014."); Weiner Aff. ¶ 9 (same); *id.* ¶ 7 (opining, based on video

footef, that Plaintiff's arm was not positioned "in an anatomically abnormal manner that caused an objectively verifiable injury" to Plaintiff's "left arm or shoulder joint")).

Therefore, Plaintiff's excessive force claim also fails because she did not show that Defendant's actions caused her injury or that her injuries from the handcuff removal itself were more than de minimis. *See Faruki v. City of New York*, No. 10-CV-9614, 2012 WL 1085533, at *7 (S.D.N.Y. Mar. 30, 2012), *aff'd*, 517 F. App'x 1 (2d Cir. 2013) (granting summary judgment where the plaintiff's allegations of serious injuries to her wrist and hand from handcuffing were not substantiated by corroborating medical evidence); *Lemmo v. McKoy*, No. 08-CV-4264, 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011) (listing cases dismissing excessive force claims when the resulting injury is "de minimis"—such as "short-term pain, swelling, and bruising," and "claims of minor discomfort from tight handcuffing"); *Esmont v. City of New York*, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005) (granting summary judgment where "[t]he only evidence [the plaintiff] . . . offered suggesting injury [was] her testimony that she suffers diminished use of her left wrist," but she provided "no medical evidence verifying this claim" and her x-rays showed "no fracture, dislocation, or effusion" (internal quotation marks omitted)); *id.* ("Unsubstantiated claims of nerve damage, in the absence of corroborating medical evidence, are insufficient to support a claim of excessive force from handcuffing."); *see also Kalfus*, 476 F. App'x at 881 ("[The plaintiff] points to nothing in the record to refute his own surgeon's testimony that the rotator cuff tear was an extension of a pre-existing tear, about which [the plaintiff] failed to inform the arresting officers.").[36]

---

[36] Because the Court concludes that Defendant did not violate the Fourth Amendment, it need not reach Defendant's alternative argument that she is entitled to qualified immunity because she did not violate clearly established law. (Def.'s Mem. 14–18.) *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that district courts have discretion to "decid[e] which of the two prongs of the qualified immunity analysis should be addressed first").

### III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 173), enter judgment for Defendant, close this case, and mail a copy of this Opinion to Plaintiff.

SO ORDERED.

DATED:   March 29, 2018
         White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE